PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
Alan W. Kornberg
Adam M. Denhoff
Jeanne L. John

*Attorneys for the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| EnQuest PLC,[1] | Case No. 16-_____ (___) |
| Debtor in Foreign Proceedings. | |

**VERIFIED PETITION FOR RECOGNITION OF FOREIGN MAIN PROCEEDINGS AND MOTION FOR ORDER GRANTING RELATED RELIEF PURSUANT TO SECTIONS 1504, 1507, 1515, 1517, 1520 AND 1521 OF THE BANKRUPTCY CODE**

Stefan Ricketts, in his capacity as the duly authorized foreign representative (the "Foreign Representative") of EnQuest PLC (the "Debtor"), which is the subject of proceedings (the "English Proceedings") relating to a scheme of arrangement (the "Scheme") commenced under Part 26 of the Companies Act 2006 of England and Wales, as modified, amended or re-enacted from time to time (the "Companies Act"), and pending before the High Court of Justice of England and Wales (the "English Court"), respectfully submits this *Verified Petition for Recognition of Foreign Main Proceedings and Motion for Order Granting Related Relief Pursuant to Sections 1504, 1507, 1515, 1517, 1520 and 1521 of the Bankruptcy Code* (the "Petition and Motion") seeking entry of the order attached as Exhibit A (the "Proposed Order")

---

[1]     The Debtor in the foreign proceedings, along with the last four digits of its registered company number, is EnQuest PLC [0891].  The location of the Debtor's corporate headquarters and registered office is: Cunard House, 5th Floor, 15 Regent Street, London, SW1Y 4LR, United Kingdom.

granting, among other relief, recognition of the English Proceedings as foreign main proceedings pursuant to chapter 15 of the Bankruptcy Code (as defined below).  In support of this Petition and Motion, the Foreign Representative refers the Court to the following contemporaneously filed materials: (x) the *Declaration of Stefan Ricketts in Support of (I) Verified Petition for Recognition of Foreign Main Proceedings and Motion for Order granting Related Relief Pursuant to Sections 1504, 1507, 1515, 1517, 1520 and 1521 of the Bankruptcy Code; and (II) Certain Related Relief* (the "Ricketts Declaration");[2] and (y) the *Declaration of Giles Boothman in Support of Verified Petition for Recognition of Foreign Main Proceedings and Motion for Order Granting Related Relief Pursuant to Sections 1504, 1507, 1515, 1517, 1520 and 1521 of the Bankruptcy Code* (the "Boothman Declaration," and together with the Ricketts Declaration, the "Supporting Documents").  In further support of the relief requested herein, the Foreign Representative states as follows:

## PRELIMINARY STATEMENT

The Debtor is the largest independent oil producer in the United Kingdom (the "U.K.") North Sea (as last measured for the 12 months ended May 31, 2016), with operations predominantly in the U.K. Continental Shelf.  The Debtor commenced this chapter 15 case (the "Chapter 15 Case") in support of the Scheme as a part of a wider financial restructuring (the "Restructuring") of the Debtor and its subsidiaries (collectively, the "Group").

The primary objectives of the Restructuring, of which the Scheme forms a part, are to: (i) avoid the adverse consequences of an accelerated marketing and sale process of the Group, or parts of the Group, which may prove value-destructive to the operating business, and following completion of which the Debtor expects that it would be placed into insolvent

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Ricketts Declaration.

liquidation; (ii) ensure a stable and sustainable Group capital structure; (iii) enable the Group to direct its cash resources towards bringing its Kraken development to first oil as soon as possible; (iv) service the Group's general corporate and working capital requirements; and (v) improve the ongoing liquidity position of the Group, putting it in a stronger position to withstand a period of low oil prices.

The key features of the Restructuring, which are described more fully below, are: (i) exchange of the Debtor's High Yield Notes (as defined below) on a dollar-for-dollar basis for the New High Yield Notes (as defined below), to be effected through the Scheme; (ii) amendments to the Debtor's Retail Notes (as defined below), to be effected through the Scheme; (iii) recognition of the Scheme under chapter 15 of the Bankruptcy Code; (iv) certain amendments to the Existing RCF (as defined below); (v) an equity raise of approximately £82 million through the Placing and Open Offer (as defined below) of up to 356,738,114 new ordinary shares; and (vi) renewal of certain of the Surety Bond Facilities (as defined below).  All of the elements of the Restructuring are inter-conditional and the Restructuring is unlikely to be completed if any of the elements are not approved and/or implemented (as applicable).

When the Restructuring is consummated, it is anticipated that the amended debt profile of the Group and the injection of additional equity capital will reduce the financial burden on the business, enabling the Group to continue to operate profitably despite the current weak macroeconomic climate in the oil industry.  Moreover, the Debtor will be able to direct its cash resources towards bringing its primary development asset—the Kraken development—to first oil as soon as possible.

The Restructuring enjoys the support of many of the constituents of the Debtor's capital structure.  Specifically, on October 11, 2016, all RCF Lenders (as defined below), all

3

Hedging Banks (as defined below) and High Yield Noteholders (as defined below) representing approximately 61% in principal amount outstanding of the High Yield Notes entered into a lock-up agreement with the Debtor (the "Lock-up Agreement").  Pursuant to the Lock-up Agreement, the parties agreed, among other things and subject to certain conditions, to take all steps and other actions reasonably necessary to support, facilitate, implement, consummate or otherwise give effect to the Restructuring, including, in respect of the participating High Yield Noteholders, by attending the Debtor Scheme Meeting (as defined below) in person or by proxy and voting in favor of the Scheme, and by not taking certain enforcement actions with respect to the Debtor, including in respect of the October Interest Payment.

Due to the diverse nature of the holders of the Debtor's Retail Notes, it was not possible for the Debtor to approach all of the Retail Noteholders (as defined below) in advance of the announcement of the Restructuring and the Scheme.  However, the Debtor has consulted on a confidential basis with a number of Retail Noteholders who together hold a significant percentage of the aggregate outstanding amount of the Retail Notes to obtain their indicative support for the proposals contemplated by the Scheme and the Restructuring.  The feedback from such Retail Noteholders was positive and indicated support for the Restructuring from professional investors.  Significantly, the Restructuring will not affect obligations owed to employees, customers and suppliers, which will continue to be honored in the ordinary course.

The Chapter 15 Case has been filed to give effect in the United States to the Scheme and the proposed English Court order sanctioning the Scheme (the "Sanction Order) to: (a) ensure that all of the Scheme Creditors (as defined below) are treated consistently, regardless of whether they are located in the U.K. or the United States; (b) protect the Debtor and its property from any lawsuits in the United States from those who are bound by, and benefit from,

4

the terms of the Scheme; and (c) minimize the risk of indemnification and other claims that might be alleged under the U.S. law indenture that governs the High Yield Notes.[3]  Accordingly, in support of the Restructuring already underway in the U.K., and to ensure the Debtor's continued, uninterrupted business, the Debtor seeks recognition of the English Proceedings as foreign main proceedings and related ancillary relief in support thereof.

## JURISDICTION AND VENUE

1.      The Court has subject-matter jurisdiction pursuant to sections 157 and 1334 of title 28 of the United States Code, section 1501 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code"), and the Amended Standing Order of Reference dated January 31, 2012, Reference M-431, *In re Standing Order of Reference Re: Title 11*, 12 Misc. 00032 (S.D.N.Y. Feb. 2, 2012) (Preska, C.J.).  This matter is a core proceeding pursuant to section 157(b)(2)(P) of title 28 of the United States Code.

2.      Venue is proper in this district pursuant to section 1410 of title 28 of the United States Code as the Debtor's sole assets in the United States are located in New York.  The Foreign Representative has properly commenced this case pursuant to sections 1504 and 1509 of the Bankruptcy Code by filing a petition for recognition of the English Proceedings under section 1515 of the Bankruptcy Code.

---

[3]     A meeting of the Scheme Creditors (as defined below) affected by the Scheme for the purpose of considering and, if thought fit, approving the Scheme will be held on November 14, 2016 (the "Debtor Scheme Meeting"). If the Scheme is agreed to by a majority in number, representing at least 75% in value, of the Scheme Creditors at the Debtor Scheme Meeting, a hearing before the English Court seeking entry of the Sanction Order (the "Sanction Hearing") is expected to be held on November 16, 2016.  If the English Court enters the Sanction Order, the Scheme will become effective pursuant to its terms, and thereby binding on all Scheme Creditors of the Debtor wherever located, upon delivery of the Sanction Order to the Registrar of Companies in England and Wales.  Importantly, however, this Court's entry of an order recognizing the Scheme in the United States is a condition precedent to the implementation of the Scheme, and therefore, the implementation of the Restructuring.

3.      Sections 1504, 1507, 1515, 1517, 1520 and 1521 provide the statutory

basis for the relief requested herein.

## BACKGROUND

4.      The following summarizes the Debtor's business, capital structure and

events leading to the Restructuring, of which the Scheme forms a part, and commencement of

the Chapter 15 Case.  The Supporting Documents provide additional detailed information about,

among other things, the Debtor, its capital structure, operations and industry challenges.

**A.      Overview of the Debtor's Business**

5.      The Debtor is an oil and gas production and development company

focused on maturing assets and undeveloped oil fields.  The Group operates predominantly in the

U.K. Continental Shelf.  For the 12-month period ending on May 31, 2016, the Group was the

largest independent oil producer in the North Sea, with production from offshore oil fields in the

U.K. Continental Shelf.

6.      The Debtor's producing operated assets in the U.K. Continental Shelf

include the Thistle/Deveron, Heather/Broom, Dons, Greater Kittiwake and Alma/Galia oil fields.

The Debtor also has an interest in the non-operated Alba producing oil field.  As of June 30,

2016, the Group had interests in 29 U.K. production licenses covering 41 blocks or part-blocks

and was the operator of 26 of those licenses.  The Group also has two currently producing assets

in Malaysia: PM8/Seligi and Tanjong Baram.

7.      The Group's primary development asset is the Kraken development,

which the Group operates and in which it owns a 70.5% working interest.  The Kraken

development is the Group's largest project to date and one of the largest projects in the U.K.

Continental Shelf in recent years.  The Debtor expects the Kraken development to deliver first oil

in the first half of 2017.  The Group also owns a 50% working interest in, and is the operator of,

the Scolty/Crathes development, which was the only offshore pure oil field approved by the U.K.

Oil and Gas Authority in 2015.[4]  The Debtor expects that the Scolty/Crathes fields will deliver

first oil around the end of 2016.

8.      The Group's average daily production on a working interest basis for the

six-month period ending on June 30, 2016, was 42,520 boepd, and its net 2P reserves were 216

MMboe as of January 1, 2016.  During the first half of 2016, the Debtor's producing assets

generated EBITDA of $242.9 million.

**B.      The Debtor's Pre-Restructuring Corporate and Capital Structure**

9.      The Debtor was incorporated under the laws of England and Wales on

January 29, 2010.  The Debtor's headquarters and registered office is located at 5th Floor Cunard

House, 15 Regent Street, London, SW1Y 4LR, United Kingdom.

10.     The Debtor's shares are publicly listed on both the London Stock

Exchange and the NASDAQ OMX Stockholm under the symbol "ENQ."  The Debtor's

outstanding share capital consists of 802,660,757 ordinary shares, which carry one vote each.

11.     As noted above, most of the Group's assets are located in the U.K.  As of

August 31, 2016, the Group employed approximately 433 people, approximately 291 of which

work in the U.K.  The Debtor's U.S. assets are (i) a $50,000 undrawn professional fee retainer

(the "Retainer") held by Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss"), as

counsel to the Foreign Representative and the Debtor, in a non-interest bearing account located

with Citibank, N.A. in New York, New York, and (ii) intangible contract rights under the High

Yield Notes Indenture (as defined below), which is governed by New York law.  As of June 30,

---

[4]      The Oil and Gas Authority was established to regulate, influence and promote the U.K. oil and gas industry, in
conjunction with other regulatory authorities, and has a range of powers to deliver on this mandate.

2016, the Debtor had total consolidated assets of approximately $3.97 billion and total

consolidated liabilities of approximately $3.23 billion.

12.     The Debtor is the principal borrower under the Senior Secured Revolving

Credit Facility Agreement, dated as of March 6, 2012 (as amended, supplemented or otherwise

modified from time to time, the "Existing RCF") between, among others, the Debtor, as an

original borrower, and BNP Paribas, as facility agent.  Borrowings under the Existing RCF may

be used to fund the Debtor's oil and gas-related expenditures and for general working capital

purposes.  The aggregate commitments under the Existing RCF are $1.2 billion, which can in

certain circumstances be increased to $1.7 billion.  As of October 18, 2016, approximately

$1,002,277,000 was outstanding under the Existing RCF and the Group had utilized letters of

credit of $7 million.

13.     Pursuant to that certain Senior Notes Indenture, dated as of April 9, 2014

(as amended, supplemented or otherwise modified from time to time, the "High Yield Notes

Indenture"), between, among others, the Debtor, as issuer, and Deutsche Trustee Company

Limited, as trustee (the "High Yield Notes Trustee"), the Debtor issued $650 million in

aggregate principal amount of 7.0% senior unsecured notes due April 15, 2022 (the "High Yield

Notes").  The High Yield Notes Indenture and the guarantees of the High Yield Notes (described

below) are governed by New York law.

14.     Pursuant to that certain Trust Deed (as amended, supplemented or

otherwise modified from time to time, the "Trust Deed"), dated as of January 24, 2013, between,

among others, the Debtor, as issuer, and U.S. Bank Trustees Limited, as trustee (the "Retail

Notes Trustee"), the Debtor issued £155 million in aggregate principal amount of 5.5% senior

unsecured retail notes due February 15, 2022 (the "Retail Notes," and, together with the High

Yield Notes, the "Notes") under its £500 million Euro Medium Term Note Program.

15.    The Notes are guaranteed by certain of the Debtor's direct and indirect

subsidiaries, being EnQuest NWO Limited, EnQuest Heather Limited, EnQuest Britain Limited,

EnQuest Heather Leasing Limited, EnQuest ENS Limited, EnQuest Global Limited and EQ

Petroleum Sabah Limited (collectively, the "Notes Guarantors").  The Notes Guarantors are all

direct and indirect subsidiaries of the Debtor and are also borrowers under the Existing RCF.

16.    The High Yield Notes and the Retail Notes rank *pari passu* in right of

payment with each other and are senior unsecured obligations of the Debtor.  However, pursuant

to the terms of a subordination agreement, dated April 9, 2014 (as amended, supplemented or

otherwise modified from time to time), the guarantees in respect of the Notes are subordinated to

the Notes Guarantors' obligations under the Existing RCF.

17.    The Group currently has surety bond facilities (the "Surety Bond

Facilities") provided by HCC International Insurance Company PLC and Liberty Mutual

Insurance Europe in respect of certain of the Group's decommissioning obligations in the U.K.

The Surety Bond Facilities are for an aggregate amount of £89.2 million and $5.0 million, of

which £2.0 million mature in September 2017, with the remaining amount maturing in December

2016.

18.    The Group also maintains certain commodity hedges and foreign

exchange derivatives to manage its exposure to movements in oil and gas prices and currency

fluctuations, respectively.  In connection with these activities, the Group has entered into ISDA

master agreements (the "Hedging Agreements") with several hedging partners, the ("Hedging

Banks"). The aggregate outstanding amount under the Hedging Agreements is secured and ranks *pari passu* with the Existing RCF.

**C.**    **Effect of the Low Oil Price Environment on the Debtor's Operations**

19.    Oil prices have declined significantly since the second half of 2014, with the average realized price for the Group's U.K. Continental Shelf and Malaysian oil sales (excluding hedging) together decreasing from approximately $100.60 per barrel for the year ended December 31, 2014, to $50.90 per barrel for the year ended December 31, 2015, and from approximately $58.00 per barrel for the six months ended June 30, 2015, to $41.00 per barrel for the six months ended June 30, 2016. The Brent crude oil benchmark (which is the benchmark against which the Group's U.K. Continental Shelf production is priced) reached a low of $27.88 per barrel on January 20, 2016. Although oil prices have stabilized somewhat, they remain significantly below the levels that prevailed in 2013 and the first half of 2014 (with the Brent crude oil benchmark at a high of $118.90 on February 8, 2013). The Brent crude oil benchmark was $49.99 per barrel as of October 17, 2016. This reduction in oil prices has had a significant negative impact on the Group's revenues and cash flows from operating activities.

20.    In response to the decline in oil prices, the Group has set a number of strategic priorities including delivering on execution, streamlining operations, and strengthening its balance sheet. The Group has continued to focus on delivering a strong operational performance, as demonstrated by the 31.1% increase in the Group's net daily average production in 2015 and a 43.3% increase in the net daily average production in the six months ended June 30, 2016 (compared to the same period in the prior year), and reduced operating costs described in more detail below. The Group has also taken a number of additional measures to address the impact of the decline in oil prices and the Group's cash flow constraints, including the following:

(a)    <u>Negotiating amendments to certain financial covenants in the Existing RCF and the Retail Notes</u>: In January 2015, the Group negotiated temporary amendments to certain of the financial covenants in the Existing RCF, raising the net debt/EBITDA covenant to 5.0x and reducing the ratio of EBITDA to financing charges to a minimum of 3.0x, both until mid-2017, thereby providing the Debtor with additional headroom in the low oil price environment.  In May 2015, following approval by the Retail Noteholders, the financial covenants in the Retail Notes were amended to align them with the amendments to the Existing RCF.  The Debtor is seeking further changes to the Existing RCF and the Retail Notes as part of the Restructuring.

(b)    <u>Engaging in commodity hedging activities</u>: In line with its financial policies, the Group entered into a number of commodity hedging contracts in 2014, partially hedging the Debtor's exposure to fluctuations in oil prices.  The Group entered into additional hedging contracts in 2015 as a response to the continued low oil price environment.  As of December 31, 2015, the Group's commodity hedging contracts included bought put options over 8MMbbls maturing throughout 2016, with an average strike price of $68.00 per barrel, and oil swap contracts to sell 2MMbbls at $66.64 per barrel maturing throughout 2016.  These hedging arrangements considerably mitigated the fall in the Group's revenues for the year ended December 31, 2015, as the Group recognized $261.2 million in realized gains from their oil commodity hedges and other oil derivatives during the year ended December 31, 2015.  As of June 30, 2016, the Group's commodity hedging contracts included bought put options over 4.3 MMbbls at an average price of $68 per barrel maturing throughout 2016 and oil swap contracts to sell 1.3 MMbbls at an average price of $67 per barrel maturing throughout 2016.  The Debtor has also sold 500,000 barrels per month for the first half of 2017 (3 MMbbls total) at a fixed price of $49 per barrel and has bought a call (nil cost) for the same notional quantity, with a strike at $57.25.  Should the price rise above $57.25, the Group will receive the difference to offset the loss it would make on the $49 per barrel swaps.  During the first six months of 2016, the Group realized $128.1 million in revenue relating to its commodity hedging activities, which partially offset the decline in oil sales.  Since June 30, 2016, the Group entered into hedging arrangements for over one million barrels of 2017 production (73 kbbls per month) at a fixed price of $51.50.  In addition, the Group hedged 500,000 barrels for the first half of 2017 at $54.50.

(c)    <u>Divesting non-core assets</u>: In 2015, as part of its investment prioritization program, the Group disposed of its interests in assets in Norway, Egypt and Tunisia and its exploration assets in Malaysia.  The Debtor also relinquished its interests in a number of exploration licenses in the U.K.  These divestments have allowed the Group to focus on enhancing production at its currently producing assets, including bringing

11

Alma/Galia into full production, and developing its core development assets—Kraken and Scolty/Crathes.

(d)    Reducing operating costs: Although the Group has always been focused on cost efficiency, it has made further significant cuts to its cost base since the decline in oil prices, including through lowering supply chain, contractor and staff costs, moving its procurement team to Dubai to take advantage of lower cost structures and working with the Sullom Voe Terminal operator to reduce gross cost levels.  The Debtor reduced average unit operating costs in 2015 to $30 per barrel (compared to $42 per barrel in 2014) and in the first half of 2016 to $23 per barrel (compared to $39 per barrel in the first half of 2015).  The Debtor expects its average unit operating costs for the full year 2016 to be around the lower end of the guidance of $25-27 per barrel and expects unit operating costs to decrease to the low $20s per barrel when Kraken comes on-stream.

(e)    Reducing capital expenditure on the Kraken development: The gross full cycle capital expenditure estimate for Kraken has been reduced by approximately $675 million since the development was sanctioned in 2013, including the latest reduction of an additional $100 million announced in October 2016.  The expected gross full cycle project cost has therefore been reduced from approximately $3.2 billion at sanction to approximately $2.5 billion.

(f)    Improving future cash flows through the development of Kraken and Scolty/Crathes: The Debtor expects that Kraken will deliver first oil in the first half of 2017 and that the Scolty/Crathes fields will deliver first oil around the end of 2016.  The increase in production and, as a result, revenues brought about by the completion of these developments, combined with reduced capital expenditure and operational costs, would improve the Group's cash flow position.

(g)    Deferring certain trade creditor obligations: The Group recently agreed to the deferral of certain payments owed to several of its key trade suppliers, particularly those involved in the Kraken development, which the Debtor believes demonstrates the trade suppliers' willingness to support the Debtor.  Pursuant to these arrangements, these trade suppliers have agreed for outstanding liabilities to be deferred in accordance with agreed repayment profiles, allowing the Group to repay these liabilities through periodic payments between October 2016 and April 2019.

**D.**    **Events Preceding Commencement of the English Proceedings**

21.    Notwithstanding the measures adopted (as described above), the recent decline in oil prices and the continuing low oil price environment have had a significant negative impact on the Group's revenues, liquidity and available cash resources.  This situation has been exacerbated by the Group's level of debt and the significant cash resources required to service the interest on this debt, as well as by the significant capital expenditure required for development assets—particularly, the Kraken development asset, the Group's largest project to date.  These combined factors have put considerable pressure on the Group's cash flows.

22.    Additionally, an interest payment of $22.75 million has been due on the High Yield Notes since October 17, 2016 (the "October Interest Payment"), which the Debtor has not paid, and does not anticipate that it will be able to pay.  If the October Interest Payment is not made within the applicable 30-day grace period and there is no interest payment deferral agreed to by the requisite majority of holders of the High Yield Notes (the "High Yield Noteholders") (being 90% or more of the aggregate principal amount outstanding), this would constitute an event of default under the High Yield Notes and would trigger cross defaults across the Group's other debt instruments and facilities.

23.    In addition, the Group has, since January 2015, obtained waivers from lenders under the Existing RCF (the "RCF Lenders") in respect of the liquidity covenant contained in the Existing RCF, and the current waiver from this covenant expires on December 31, 2016.  To the extent that the Group is unable to improve its liquidity position or obtain further waivers from the RCF Lenders, the Group could fail to meet the liquidity covenant when next tested on December 31, 2016, or on a subsequent test date, which would constitute an event

of default under the Existing RCF and would trigger cross defaults across the Group's other debt instruments and facilities.

24.     Although the Group has already undertaken a number of measures to mitigate the impact of the low oil price environment and address the Debtor's working capital shortfall (as described above), the Debtor believes that in order for the Group to continue to pursue its current strategy (and, in particular, bring Kraken to first oil) and maintain the viability of the Group's business going forward, a longer term solution is needed to strengthen the Group's liquidity position and reduce the burden of the Group's debt service obligations on its business.

25.     In addition to the measures taken by the Debtor described above, it has explored a number of other options to strengthen its liquidity position and reduce the burden of its debt service obligations.  Specifically, the Debtor has engaged in discussions to sell additional assets, including with Delek Group Ltd. regarding the potential farm-out of 20% of the Debtor's interest in the Kraken development; however, the Debtor and Delek Group Ltd. have been unable to reach an agreement.  The Debtor has also explored refinancing the Existing RCF or the Notes; but, given the size of the available commitments under the Existing RCF and the outstanding principal amount of the Notes, coupled with current macroeconomic conditions and the depressed oil price environment, the Debtor does not believe it would be possible to refinance the Existing RCF or the Notes on the same or more favorable terms.  Additionally, the Debtor has engaged in discussions with various third-party lenders and the Debtor's key stakeholders, including the RCF Lenders and the informal ad hoc committee of High Yield Noteholders (the "Ad Hoc Noteholder Committee"), regarding the incurrence of new debt; nevertheless, the Debtor has concluded that additional debt financing on acceptable terms other than in connection

with the Restructuring is not available within the time frame necessary to alleviate the pressure on its liquidity.

26.    The Debtor has engaged in extensive negotiations with its relevant stakeholders in order to address these issues and, as a result, has proposed the Restructuring, of which the Scheme is an integral part.  The Restructuring, if implemented, is likely to enable the Group to complete the Kraken and Scolty/Crathes developments, which the Debtor expects will lead to both significant increases in production and significant decreases in average operating costs across the business.  Consummation of the Restructuring, and completion of the Kraken and Scolty/Crathes developments, will put the Group in a stronger position to meet current oil market conditions as the Debtor continues to consider that the Group's fundamental business, with its strategy of targeting mature and marginal oil assets and its focus on cost efficiency, is well placed to withstand a prolonged period of low oil prices.

27.    On October 11, 2016, following negotiations with its key stakeholders, including RCF Lenders and the Ad Hoc Noteholder Committee, the Debtor entered into the Lock-up Agreement with: (i) all of the RCF Lenders; (ii) all of the Hedging Banks; and (iii) High Yield Noteholders holding approximately 61% of the aggregate principal amount of outstanding High Yield Notes.  Pursuant to the Lock-up Agreement, the parties agreed, among other things and subject to certain conditions, to take all steps and other actions reasonably necessary to support, facilitate, implement, consummate or otherwise give effect to the Restructuring, including, in respect of the participating High Yield Noteholders, by attending the Debtor Scheme Meeting in person or by proxy and voting in favor of the Scheme, and by not taking certain enforcement actions with respect to the Debtor, including in respect of the October Interest Payment.

28.    Due to the diverse nature of the holders of the Retail Notes, it was not possible for the Debtor to approach all of the holders of Retail Notes (the "Retail Noteholders") in advance of the announcement of the Restructuring including, in particular, the Scheme. However, the Debtor has consulted on a confidential basis with a number of holders, who together hold a significant proportion of the Retail Notes, in order to obtain their indicative support for the proposals contemplated by the Scheme and the Restructuring. The feedback from such Retail Noteholders was positive and indicated support for the Restructuring from professional investors.

E.    **Description of the Scheme and the Restructuring**

29.    The primary objectives of the Restructuring, and therefore the Scheme, are to: (i) avoid the adverse consequences of an accelerated marketing and sale process of the Group, or parts of the Group, which may prove value destructive to the operating business, following completion of which the Debtor expects that it would be placed into insolvent liquidation (the recovery for Scheme Creditors, among others, in such a scenario would be unpredictable and is likely to be significantly less than if the Restructuring is successfully completed); (ii) ensure a stable and sustainable Group capital structure, so that the Group will possess a strengthened balance sheet and more appropriate debt service and maturity profile in light of the current market environment, including the prevailing depressed oil price; (iii) enable the Group to direct its cash resources towards bringing its Kraken development to first oil as soon as possible, which the Debtor believes will considerably strengthen the Group's operations (Kraken is expected to increase the Group's current production substantially and has a productive life over 20 years, and it is expected to benefit from lower operating costs, which the Debtor's directors expect will reduce the Group's average unit operating costs to the low $20s per barrel once Kraken is fully

on stream); (iv) service the Group's general corporate and working capital requirements; and (v)

improve the ongoing liquidity position of the Group, putting it in a stronger position to withstand

a period of low oil prices.

30.     If the Restructuring is implemented, the Debtor's directors anticipate that

the proposed amended debt profile of the Group (including the Cash Interest Payment Condition

(as defined below) in respect of the Notes to be implemented pursuant to the Scheme described

further below) and the injection of additional equity capital into the Group will reduce the

financial burden on the business, enabling the Group to continue to trade despite the current

weak macroeconomic climate in the oil industry.

31.     The Restructuring and the Scheme are described in detail in the

explanatory statement attached as Exhibit D to the Ricketts Declaration and include the

following key terms:

(a)     High Yield Notes Exchange: The High Yield Notes will be
exchanged on a dollar-for-dollar basis for new notes (the "New High Yield
Notes") to be effected through the Scheme.  The New High Yield Notes will:

(i)     accrue a fixed coupon of 7% per annum payable semi-
annually in arrear.  Interest under the New High Yield Notes will only be
payable in cash on an interest payment date if: (A) over the six months
immediately preceding the day which is one month prior to the relevant
interest payment date under the New High Yield Notes, the average end of
the day Dated Brent Future (as published by Platts) (or such equivalent
price that may replace the dated Brent price from time to time) is equal to
or above $65.00 per barrel; and (B) no payment event of default is
continuing under the Existing RCF (which shall include any such event of
default arising as a result of the aggregate amount of the loans and letters
of credit outstanding under the Existing RCF exceeding the aggregate
commitments applicable at such time) (collectively, the "Cash Payment
Condition").  If the Cash Payment Condition is not satisfied in respect of
an interest payment date, interest will not be paid in cash on that interest
payment date and will be capitalized and satisfied by the issue of
additional New High Yield Notes to holders of the New High Yield Notes
outstanding at such time.  The Cash Payment Condition in the New High
Yield Notes will cease to apply (and thereafter all payments of interest

17

will be made in cash) upon the earlier of: (A) the repayment in full of the Existing RCF from cash generated from assets of the Group; or (B) the repayment or refinancing in full of the Existing RCF on terms that enable the disapplication of the Cash Payment Condition and future interest on the New High Yield Notes and the Amended Retail Notes (as defined below) to be paid in cash.  Any interest due but not paid on the High Yield Notes prior to the effective date of the Restructuring will be capitalized and added to the principal amount of the New High Yield Notes to be issued pursuant to the Scheme;

(ii)     contain amendments to certain financial indebtedness baskets and a restriction on certain payments to shareholders (and their affiliates) if the Debtor has not redeemed (in cash at par pursuant to a new optional redemption right) the New High Yield Notes in an amount equal to any capitalized interest thereon, together with accrued but unpaid interest.  The Placing and Open Offer will not constitute an "Equity Offering" for the purpose of the optional redemption provisions of the New High Yield Notes and will not build up the Restricted Payments (under and as defined in the New High Yield Notes) build-up basket or be used to make any Restricted Payments;

(iii)     have an originally scheduled maturity date of April 15, 2022.  The Debtor will have the option (at its absolute discretion) to extend, at any time, the maturity date to April 15, 2023.  In addition, the maturity of the New High Yield Notes will be automatically extended to October 15, 2023 if the Existing RCF is not repaid or refinanced in full prior to October 15, 2020;

(iv)     have the benefit of a new cross default provision such that an event of default under the Amended Retail Notes will give rise to an event of default under the New High Yield Notes;

(v)     not contain a right of the Debtor to apply the net proceeds of one or more equity offerings in early redemption of the New High Yield Notes at a specified price; and

(vi)     be issued in global registered form and deposited with a common depositary for Euroclear and Clearstream, Luxembourg.  The New High Yield Notes will not be eligible for settlement in The Depositary Trust Company.  Any New High Yield Notes which cannot be issued to High Yield Noteholders shall be issued to and held by Lucid Issuer Services Limited on trust for the relevant High Yield Noteholder for a period of one year from the date that the Scheme becomes effective.

(b)     Retail Note Amendments: The Retail Notes will be amended and restated pursuant to the Scheme (the "Amended Retail Notes") and the Amended Retail Notes will:

18

(i)        accrue a fixed coupon of 7% per annum payable semi-annually in arrear.  Interest under the Amended Retail Notes will only be payable in cash on an interest payment date if the Cash Payment Condition (as described in paragraph 31(a) herein) is satisfied.  As with the New High Yield Notes, if the Cash Payment Condition is not satisfied in respect of an interest payment date, interest will not be paid in cash on that interest payment date and will be capitalized and satisfied by the issue of additional Amended Retail Notes to holders of the Amended Retail Notes outstanding at such time.  The Cash Payment Condition in the Amended Retail Notes will cease to apply (and thereafter all payments of interest will be made in cash) upon the earlier of: (A) the repayment in full of the Existing RCF from cash generated from assets of the Group; or (B) the repayment or refinancing in full of the Existing RCF on terms that enable the disapplication of the Cash Payment Condition and future interest on the New High Yield Notes and the Amended Retail Notes to be paid in cash.  Interest on the Amended Retail Notes will continue to accrue from the immediately preceding interest payment date of August 15, 2016 and be paid on the next interest payment date of February 15, 2017 in cash (subject to the Cash Payment Condition being satisfied) or be capitalized;

(ii)        contain a restriction on certain payments to shareholders (and their affiliates) if the Debtor has not redeemed (in cash at par pursuant to a new optional redemption right) the Amended Retail Notes in an amount equal to any capitalized interest thereon, together with accrued but unpaid interest;

(iii)        have an originally scheduled maturity of April 15, 2022 (extended from February 15, 2022).  The Debtor will have the option (at its absolute discretion) to extend, at any time, the maturity date to April 15, 2023.  In addition, the maturity of the Amended Retail Notes will be automatically extended to October 15, 2023 if the Existing RCF is not repaid or refinanced in full prior to October 15, 2020;

(iv)        not have the benefit of the existing financial covenants currently incorporated in the trust deed that governs the Retail Notes;

(v)        have the benefit of a new cross default provision such that an event of default under the New High Yield Notes will give rise to an event of default under the Amended Retail Notes; and

(vi)        continue to be held in global registered form, be cleared through Euroclear and Clearstream, Luxembourg and be eligible for settlement in CREST through CREST depositary interests representing the Amended Retail Notes.

(c)      Existing RCF Amendments: The Existing RCF will be amended to, among other things: (i) extend the maturity date of the Existing RCF by two years to October 1, 2021; (ii) split the Existing RCF into a $1.125 billion term loan facility and a $75 million revolving credit facility, amending the margin on each of the facilities and cancelling the accordion feature; (iii) amending and resetting certain of the financial covenants to allow the Group sufficient headroom; (iv) amending the amortization profile for the repayment of the facilities; (v) incorporating terms allowing for new super senior hedging; and (vi) restricting certain activities of the Group including restrictions on acquisitions, disposals, financial indebtedness and exploration and appraisal expenditure;

(d)      Placing and Open Offer: The placing and open offer of, in aggregate, up to 356,738,114 new ordinary shares at an issue price of 23 pence per new ordinary share to raise gross proceeds of, in aggregate, approximately £82 million (the "Placing and Open Offer").  Double A Limited, a company beneficially owned by the extended family of Amjad Bseisu, a director of the Debtor, is proposing to participate in the Placing and Open Offer.  Double A Limited has agreed to participate in the placing on a dollar-for-dollar basis against the total number of new ordinary shares which existing shareholders commit to subscribe for on a *pro rata* basis, up to a maximum of £33.73 million, subject to clawback to satisfy valid applications by qualifying shareholders in the open offer.  In addition, Double A Limited has irrevocably undertaken to take up 31,735,702 new ordinary shares in the open offer, representing its *pro rata* share of the amount to be raised in the open offer; and

(e)      Surety Bond Renewal: The renewal of certain of the Group's Surety Bond Facilities for one year from December 2016 and a further year from December 2017, in all circumstances save for the insolvency of EnQuest Heather or the Debtor.

32.      The Scheme also provides that the "Scheme Creditors"[5] authorize the

waiver and release of the Released Parties (as defined in the Scheme), including the Debtor and

the Notes Guarantors, from certain claims relating to the High Yield Notes, the Retail Notes, the

Scheme and the Restructuring, as applicable.  Specifically, the Scheme provides that the Scheme

---

[5]     "Scheme Creditors" means: (i) the High Yield Notes Trustee; (ii) the Depository Trust Company, as the registered holder of the High Yield Notes Global Notes; (iii) Cede & Co as nominee for the Depository Trust Company; (iv) the High Yield Noteholders, as contingent creditors; (v) the Retail Notes Trustee; (vi) Société Générale Bank and Trust as the common depositary for Euroclear and Clearstream, Luxembourg, as the registered holder of the global registered certificate representing the Retail Notes; (vii) the Retail Noteholders, as contingent creditors; and (viii) Euroclear UK & Ireland Limited (or its nominee) in its capacity as the holder (through its account(s) in Euroclear) of underlying Retail Notes which are represented by Crest depository interests.

Creditors authorize the Debtor to enter into the Deeds of Release (as defined in the Scheme), which shall become effective and unconditionally and irrevocably binding upon all Scheme Creditors (and any person who acquires any interest in a Scheme Claim (as defined in the Scheme) after 5:00 pm New York time on November 10, 2016) on the Restructuring Effective Date (as defined in the Scheme). *See* Ricketts Declaration, Ex. D, app. 1 § 4.5, app. 1 at app. 5-app.6. The Deeds of Release provide that, subject to certain exceptions, the Scheme Creditors release the Released Parties from any claims they may have had, currently have or in the future may have, in connection with the High Yield Notes, the Retail Notes (but excluding, among other things, the Debtor's liability in respect of the covenant to pay principal and interest thereunder), the Scheme and the Restructuring. *See id.*, app. 1 at app. 5 § 2, at app. 6 § 2. Additionally, under the Deeds of Release, the Scheme Creditors covenant not to take certain actions against the Released Parties with respect to claims arising under the High Yield Notes and the Retail Notes, and the preparation, negotiation or implementation of the Scheme or the Restructuring. *See id.*, app. 1 at app. 5 § 3, at app. 6 § 3.

**F.      Consequences of a Failure to Implement the Restructuring**

33.      If the Scheme is not approved by the requisite majorities of Scheme Creditors, recognition of the Scheme pursuant to chapter 15 of the Bankruptcy Code is not granted, or any of the other inter-conditional requirements or conditions to the Restructuring are not satisfied (or, where possible, waived) to enable the Restructuring to be implemented in accordance with the presently proposed timetable, the Restructuring is not likely to be consummated. The Debtor believes that, in light of the considerable effort and time which it has taken for the Debtor to agree to the Restructuring with its key stakeholders (including the RCF Lenders, the Hedging Banks, the High Yield Noteholders, the providers of the Surety Bond

Facilities, Double A Limited and various other key stakeholders), the prospects of the Debtor and

such key stakeholders agreeing to an alternative transaction that would leave the Group with a

viable capital structure before it would become necessary to place the Debtor (and possibly other

companies in the Group) into an insolvency procedure are unlikely.  The Debtor has based its

assessment that the Group continues to be a going concern on the basis that the Group can rely

on the ability to access adequate funds under the Existing RCF, agree to necessary amendments

across its debt and credit facilities and with certain vendors, and/or access alternative sources of

funding.  The Debtor has enjoyed the support of its RCF Lenders throughout the negotiation of

the Restructuring.  The continued support of the RCF Lenders is now predicated upon and would

be in accordance with the Restructuring as currently proposed.

34.    The Debtor believes that if and shortly after it becomes apparent that the

Restructuring is not capable of being implemented (for example, if the requisite majority of

Scheme Creditors do not vote in favor of the Scheme, if the English Court decides not to exercise

its discretion to sanction the Scheme or if recognition of the Scheme pursuant to chapter 15 of

the Bankruptcy Code is not granted), it is likely that the Debtor will commence a marketing and

sales process of the Debtor and/or its subsidiaries with a view to effecting the sale in a short

period of two to three months.  Completion of the sale is likely to involve the appointment of

administrators to the Debtor in England pursuant to the Insolvency Act 1986 (as modified,

amended or re-enacted from time to time) (the "U.K. Insolvency Act").

35.    The Debtor believes that if the Restructuring does not proceed and a

marketing process for the sale of the Group on an accelerated basis is undertaken, there is likely

to be little or no value for High Yield Noteholders or Retail Noteholders.  In addition, if the

Debtor is unable to pay the October Interest Payment on the High Yield Notes within the 30-day

grace period as described above and the requisite majority of High Yield Noteholders (being

90% or more of the aggregate principal amount outstanding) do not agree to an interest payment

deferral, the Debtor is likely to become subject to enforcement action (including, for example,

the filing of a winding up petition against the Debtor in England) which, if not terminated or

withdrawn, could result in the majority RCF Lenders appointing an administrator to the Debtor

pursuant to the U.K. Insolvency Act, with a view to the administrator commencing and/or

continuing a marketing process for the sale of the Group on an accelerated basis.  In this

scenario, the Debtor believes that there is likely to be little or no value for High Yield

Noteholders or Retail Noteholders.  However, the Ad Hoc Noteholder Committee may propose

an alternative debt restructuring and seek to engage in discussions with the RCF Lenders and the

Debtor (which may involve providing a deferral of the October Interest Payment if the requisite

majority has approved such deferral).  The RCF Lenders may or may not decide to give

consideration to any such proposal or may consider any such proposal in the context of the

Debtor's sales process.

**G.      The English Proceedings**

36.      To implement the Scheme and therefore to implement the Restructuring,

the Debtor commenced the English Proceedings on October 18, 2016, by applying to the English

Court for permission to convene the Debtor Scheme Meeting (the "Convening Hearing").

37.      On October 24, 2016, the English Court held the Convening Hearing and

subsequently issued an order authorizing the Debtor to convene the Debtor Scheme Meeting (the

"Convening Order" and, together with the Sanction Order, the "English Orders").  The

Convening Order (i) confirms that the Debtor Scheme Meeting will be held at 11:00 am (London

time) on November 14, 2016, at the offices of Ashurst LLP, Broadwalk House, 5 Appold Street,

London, EC2A 2HA, United Kingdom, (ii) confirms the documents and notices that will be sent

to the Scheme Creditors, and (iii) declares that the Foreign Representative is authorized to act as

such in respect of the English Proceedings, including in any chapter 15 case in the United States.

*See* Ricketts Declaration, Ex. B.

38.    On October 24, 2016, this Chapter 15 Case was commenced by filing this

Petition and Motion for the Debtor along with the other Supporting Documents.

## **RELIEF REQUESTED**

39.    The Foreign Representative seeks: (a) recognition of the English

Proceedings as foreign main proceedings under sections 1515, 1517 and 1520 of the Bankruptcy

Code,[6] (b) recognition of the Foreign Representative as the "foreign representative" in respect of

the English Proceedings within the meaning of section 101(24) of the Bankruptcy Code;

(c) recognition and enforcement in the United States of the Scheme, the Convening Order, and,

to the extent that the English Court enters the Sanction Order prior to the hearing on this Petition

and Motion, the Sanction Order; (d) the grant of a stay of execution against any assets of the

Debtor (including intangible assets) in the United States and application of section 362 of the

Bankruptcy Code in this Chapter 15 Case pursuant to sections 1520(a)(1), 1521(a) and 105(a) of

the Bankruptcy Code; and (e) the grant of certain additional relief pursuant to sections 1507 and

1521 of the Bankruptcy Code, including the recognition and enforcement of the releases and

injunctions set forth in the Scheme.

---

[6]    The Foreign Representative is not seeking provisional relief at this time because it is not aware of any imminent threat to Debtor's assets located in the United States or to the English Proceedings by virtue of actions in the United States.  Should circumstances change or the Foreign Representative becomes aware of additional facts, however, the Foreign Representative reserves the right to seek the Court's assistance including pursuant to section 1519 of the Bankruptcy Code.

40.    Specifically, the Foreign Representative respectfully requests entry of the

Proposed Order granting the following relief:

(a)    recognizing the English Proceedings pursuant to section 1517 of the Bankruptcy Code as foreign main proceedings, as such term is defined in section 1502(4) of the Bankruptcy Code;

(b)    recognizing Stefan Ricketts as the duly authorized "foreign representative" of the Debtor within the meaning of section 101(24) of the Bankruptcy Code for all purposes in the Chapter 15 Case and otherwise;

(c)    granting relief automatically and as of right upon recognition of the English Proceedings as foreign main proceedings pursuant to section 1520(a), including, without limitation, application of section 362 of the Bankruptcy Code, which shall apply with respect to the Debtor and the Debtor's property (including all intangible property) that is now or in the future located within the territorial jurisdiction of the United States;

(d)    granting certain additional relief pursuant to sections 1507 and 1521 of the Bankruptcy Code (to the extent it is not granted automatically and as of right upon recognition of the English Proceedings as foreign main proceedings pursuant to section 1520(a) of the Bankruptcy Code), including an injunction prohibiting all persons and entities, other than the Foreign Representative and his representatives and agents, from:

(i)    taking or continuing any act to obtain possession of, or exercise control over, including but not limited to, attaching, repossessing, seizing, or disposing of, as applicable, the Debtor, the Released Parties, or any of their property (including intangible property) that is located within the territorial jurisdiction of the United States or any proceeds thereof (collectively, the "Property");

(ii)    transferring, encumbering, relinquishing or disposing of any Property other than to the Foreign Representative;

(iii)    commencing, continuing, or enforcing any action or legal proceeding within the territorial jurisdiction of the United States (including, without limitation, arbitration, mediation or any judicial, quasi-judicial, administrative or regulatory action, proceedings or process whatsoever), including by way of counterclaim, (each individually, an "Action") against the Debtor, the Released Parties, or any of the Property in respect of any Scheme Claim or the Debtor's or Released Parties' assets, rights,

25

obligations, or liabilities, or seeking discovery of any nature against the Debtor or the Released Parties;

(iv)    any judgment, wherever and whenever obtained, to the extent such judgment is a determination of a liability of the Debtor or any of the Released Parties with respect to any debt or liability cancelled, discharged, or restructured under the Scheme and Restructuring or as a result of English law, is unenforceable in the United States;

(v)    commencing or continuing any act or Action to create, perfect or enforce any lien, set-off or other claim against the Debtor, the Released Parties, or their Property, including, without limitation, rights under any contracts with the Debtor or the Released Parties; provided, however, that no Action described in sections 555, 556, 557, 559, 560, 561, 562 and 1519(d) and (f) of the Bankruptcy Code shall be enjoined by such injunction;

(vi)    commencing any suit, action, or proceeding in the territorial jurisdiction of the United States against the Debtor, the Foreign Representative, the Released Parties, or any of their respective successors, directors, officers, agents, employees, representatives, advisors, or attorneys in respect of any claim or cause of action, in law or in equity, arising out of relating to any action taken or omitted to be taken in connection with this Chapter 15 Case, the Scheme, or to resolve any dispute arising out of any provision of the Scheme, the Restructuring, or English law relating to the Restructuring;

(vii)    declaring or considering the filing of the English Proceedings or this Chapter 15 Case a default or event of default under any agreement, contract or arrangement; and

(viii)    taking any action in contravention to or inconsistent with the Scheme, including, without limitation, against the Debtor, the Released Parties, or any of their property within the territorial jurisdiction of the United States.

(e)    granting comity to and giving full force and effect to the English Proceedings, the Scheme, the Convening Order (as may be amended from time to time), the Sanction Order (if applicable), and any subsequent order issued by the English Court in the English Proceedings (including all discharges of claims or interests under the Scheme and any final order sanctioning such plan); and

(f)    awarding the Foreign Representative such other relief as this Court deems just and proper.

41.     The relief requested in this Petition and Motion is without prejudice to any

additional relief, including recognition and enforcement of the Sanction Order, if not entered

prior to the date of the hearing on this Petition and Motion, as well as other English Court orders,

if and when entered.

## BASIS FOR RELIEF

42.     The Foreign Representative and the Debtor seek to fully implement the

terms of the Scheme, the Convening Order and, ultimately, the Sanction Order issued by the

English Court to effectuate the Restructuring.  Towards that end, the Scheme and the English

Orders must be binding and enforceable in the United States, and the Scheme Creditors must be

precluded from taking any actions in the United States that may frustrate the Restructuring

effectuated by the English Proceedings.

43.     For the reasons set forth below and in the Supporting Documents, the

relief sought herein is appropriate under chapter 15 of the Bankruptcy Code.

**A.      The Debtor Is Eligible to File for Relief
        Under Section 109(a) of the Bankruptcy Code.**

44.     The Second Circuit Court of Appeals has held that section 109(a) of the

Bankruptcy Code applies to chapter 15 cases and requires that a foreign debtor must reside, have

a domicile or place of business, or property in the United States to be eligible to file a chapter 15

petition.  *See Drawbridge Special Opportunities Fund LP* v. *Barnet*, *(In re Barnet)*, 737 F.3d 238

(2d Cir. 2013).  Section 109(a) of the Bankruptcy Code does not require a specific quantum of

property in the United States, nor does it indicate when or for how long such property must have

a U.S. situs.  *See, e.g.*, *In re Berau Capital Res. Pte. Ltd.*, 540 B.R. 80, 82 (Bankr. S.D.N.Y.

2015).  Cases have accordingly held that bank accounts, attorney retainers deposited in New

York, or causes of action owned by the foreign debtor with a situs in New York satisfy the

"property in the United States" eligibility requirement of section 109(a) of the Bankruptcy Code. *See In re Octaviar Admin. Pty Ltd.*, 511 B.R. 361, 369-74 (Bankr. S.D.N.Y. 2014) (citing cases).

45.     Here, the Debtor is eligible to file the Chapter 15 Case.  The Debtor has property in the United States and in this jurisdiction.  Paul, Weiss, as counsel to the Foreign Representative and the Debtor, holds the $50,000 Retainer in a non-interest bearing account located with Citibank, N.A. in New York (the "Retainer Account").  The Debtor's funds remain in the Retainer Account as of the date hereof and are the Debtor's property (subject to Paul, Weiss's rights under its engagement letter).  *See, e.g.*, *id.* at 372-73 ("[A] line of authority . . . supports the fact that prepetition deposits or retainers can supply 'property' sufficient to make a foreign debtor eligible to file in the United States.") (citations omitted).

46.     In addition, the High Yield Notes Indenture is governed by New York law, and the High Yield Notes Indenture contains provisions submitting the parties thereto to the jurisdiction of New York state and federal courts.  *See* Ricketts Declaration, Ex. C §§ 11.8, 11.9; *see also Berau*, 540 B.R. at 83-84 (holding that foreign debtor was eligible to be a debtor under section 109(a) of the Bankruptcy Code because of (a) an interest in its U.S. counsel's retainer account, and (b) intangible contract rights under a New York law governed indenture).

**B.      The Procedural and Substantive Requirements of**
         **Chapter 15 of the Bankruptcy Code Are Satisfied.**

47.     In addition to satisfying the general eligibility requirements of the Bankruptcy Code discussed above, the Foreign Representative also satisfies chapter 15's filing requirements.  Specifically, chapter 15 requires that a petition for recognition of a foreign proceeding comply with the procedural requirements set forth in section 1515 of the Bankruptcy Code.  *See* 11 U.S.C. §§ 1504, 1515.  Substantive requirements must also be satisfied before a court issues a recognition order.  These include: (a) that the English Proceedings are "foreign

proceedings," and more specifically, "foreign main proceedings"; and (b) that Stefan Ricketts is

a proper "foreign representative."  11 U.S.C. § 1517.  Here, as described below, the Petition and

Motion, along with the Supporting Documents, comply with the Bankruptcy Code's procedural

and substantive filing requirements and establish that the Foreign Representative and the Debtor

are entitled to the requested relief.

>    1.    *The Petition and Motion Comply with Section 1515 of the Bankruptcy Code and
>          Bankruptcy Rule 1007(a)(4).*

48.    The Chapter 15 Case was duly and properly commenced by filing an

Official Form 401 for the Debtor, the Petition and Motion, and the Supporting Documents,

accompanied by all fees, documents and information required by the Bankruptcy Code and the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), including: (a) a corporate

ownership statement containing the information described in Bankruptcy Rule 7007.1; (b) a list

containing (i) the names and addresses of all persons or bodies authorized to administer foreign

proceedings of the Debtor, (ii) all parties to litigation pending in the United States in which the

Debtor is a party at the time of the filing of the Chapter 15 Case, and (iii) all entities against

whom provisional relief is being sought under section 1519 of the Bankruptcy Code; (c) a

statement identifying all foreign proceedings with respect to the Debtor that are known to the

Foreign Representative; and (d) a certified copy of the Convening Order.  *See* Ricketts

Declaration ¶¶ 47-49; Ricketts Declaration, Ex. B; *see also In re Bear Stearns High-Grade

Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 127 (Bankr. S.D.N.Y. 2007) ("A

case under chapter 15 is commenced by a foreign representative filing a petition for recognition

of a foreign proceeding pursuant to section 1515 of the Bankruptcy Code."), *aff'd*, 389 B.R. 325

(S.D.N.Y. 2008).

49.     Under section 1516(b) of the Bankruptcy Code, the Court is entitled to presume the authenticity of all the documents referenced above that were filed in connection with the Chapter 15 Case.  Accordingly, the requirements of section 1515 of the Bankruptcy Code and Bankruptcy Rule 1007(a)(4) have been met and this Chapter 15 Case was properly commenced.  *See* 11 U.S.C. §§ 1504, 1509(a), 1515; Bankruptcy Rule 1007(a)(4).

2.     *The Substantive Requirements for Recognition Also Are Satisfied.*

50.     Section 1517(a) of the Bankruptcy Code provides in relevant part that an order recognizing a foreign proceeding "shall" be entered if, in addition to the satisfaction of section 1515 of the Bankruptcy Code as described above, "(1) such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502; [and] (2) the foreign representative applying for recognition is a person or body . . . ."  11 U.S.C. § 1517(a).

(a)     *The English Proceedings Are Foreign Proceedings.*

51.     Section 101(23) of the Bankruptcy Code defines a "foreign proceeding" as:

> [A] collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

11 U.S.C. § 101(23).

52.     As described further in the Boothman Declaration, there should be little doubt that the English Proceedings qualify as "foreign proceedings" under section 101(23) of the Bankruptcy Code.  The English Proceedings are pending in a foreign country, England (a constituent member of the political union comprising the U.K.), under a law that allows companies to effectuate binding compromises or arrangements, including the restructuring of

liabilities, with their members or creditors (or any class of them) (*i.e.*, Part 26 of the Companies

Act) and is therefore an "adjustment of debt." *See* Boothman Declaration ¶ 7.  In this instance,

the "adjustment of debt" relates to the exchange of the High Yield Notes on a dollar-for-dollar

basis for the New High Yield Notes and the amendments to the Retail Notes being effected.  The

English Proceedings are judicial proceedings in that they required the Convening Order to

convene the Debtor Scheme Meeting and will require the Sanction Order for the Scheme to

ultimately be sanctioned, each issued by the English Court, a judicial body of the U.K.  *See id.* at

¶¶ 8-17.  Parties in interest may object to the proposed Scheme at the Convening Hearing and the

Sanction Hearing.  *See id.* at ¶¶ 8, 11, 14.

53.     Additionally, U.S. courts have consistently recognized English

proceedings under the Companies Act as "foreign proceedings" for purposes of chapter 15 of the

Bankruptcy Code.  *See, e.g.*, *In re YH Ltd.*, Case No. 16-12262-SCC (Bankr. S.D.N.Y. Sept. 8,

2016) [Dkt. No. 14]; *In re OIC Run-Off Ltd. & London & Overseas Ins. Co. Ltd.*, Case No. 15-

13054-SCC (Bankr. S.D.N.Y. Jan. 11, 2016) [Dkt. No. 18]; *In re Towergate Fin. Plc*, Case No.

15-10509-SMB (Bankr. S.D.N.Y. Mar. 27, 2015) [Dkt. No. 16]; *In re B. Endeavour Shipping

Co. Ltd.*, Case No. 15-10246-REG (Bankr. S.D.N.Y. Mar. 10, 2015) [Dkt. No. 10].

54.     Accordingly, the English Proceedings are foreign proceedings under

chapter 15 of the Bankruptcy Code.

(b)     *The English Proceedings Constitute Foreign Main Proceedings.*

55.     Section 1517(b)(1) of the Bankruptcy Code provides that a foreign

proceeding shall be recognized "as a foreign main proceeding if it is pending in the country

where the debtor has the center of its main interests."  11 U.S.C. § 1517(b)(1).  Section 1516(c)

of the Bankruptcy Code further provides that "[i]n the absence of evidence to the contrary, the

debtor's registered office . . . is presumed to be the center of the debtor's main interests."

11 U.S.C. § 1516(c). Courts generally equate the term "center of main interests" with the

concept of "principal place of business" under U.S. law. *See, e.g.*, *In re Millennium Global*

*Emerging Credit Master Fund Ltd.*, 458 B.R. 63, 72 (Bankr. S.D.N.Y. 2011) (quoting *In re Tri-*

*Cont'l Exch. Ltd.*, 349 B.R. 627, 634 (Bankr. E.D. Cal. 2006)); *In re Basis Yield Alpha Fund*

*(Master)*, 381 B.R. 37, 48 (Bankr. S.D.N.Y. 2008).

      56.    Here, the Debtor is incorporated in the U.K. and its registered offices and

headquarters are in London. *See* Ricketts Declaration ¶ 12. The Court may therefore presume

that the U.K. constitutes the Debtor's "center of main interests." 11 U.S.C. § 1516(c). The

evidence unequivocally supports the statutory presumption. *See* Ricketts Declaration ¶¶ 8-10,

45. Most of the Debtor's existing assets are located in the U.K. North Sea. *See id.* at ¶¶ 8-10.

Indeed, the Debtor's primary development asset—the Kraken development, which the Debtor

operates and in which it owns a 70.5% working interest—is one of the largest projects in the

U.K. Continental Shelf in recent years. *Id.* Given the presumption of section 1516(c) of the

Bankruptcy Code and the supporting factual information presented in this Petition and Motion,

as further detailed in the Supporting Documents, the U.K. constitutes the Debtor's "center of

main interests" and the English Proceedings constitute "foreign main proceedings" under the

Bankruptcy Code.

      (c)    *Stefan Ricketts Is a Proper "Foreign Representative."*

      57.    Section 101(24) of the Bankruptcy Code defines "foreign representative"

as:

> [A] person or body, including a person or body appointed on an interim
> basis, authorized in a foreign proceeding to administer the reorganization
> or the liquidation of the debtor's assets or affairs or to act as a
> representative of such foreign proceeding.

11 U.S.C. § 101(24).

58.   A committee duly appointed by the Debtor's board of directors previously met and appointed by resolution Stefan Ricketts as the Foreign Representative. *See* Ricketts Declaration, Ex. A § 7.[7]   In addition, the Convening Order expressly authorizes and designates Stefan Ricketts as the Foreign Representative. *See* Ricketts Declaration, Ex. B ¶¶ 16-17. Accordingly, Stefan Ricketts is a "foreign representative" as defined in the Bankruptcy Code. *See* 11 U.S.C. § 1516(a) ("If the decision [commencing the foreign proceeding] . . . indicates . . . that the person or body is a foreign representative, the court is entitled to so presume."); *cf. In re SPhinX, Ltd.*, 351 B.R. 103, 116-17 (Bankr. S.D.N.Y. 2006), *aff'd*, 371 B.R. 10 (S.D.N.Y. 2007) (holding that section 101(24) of the Bankruptcy Code was satisfied where foreign representatives submitted a "copy of the Cayman Court's order appointing them to administer the [d]ebtors' winding up under [Cayman law] and authorizing their commencement of these chapter 15 cases").

**C.   The Court Should Grant Discretionary
Relief Pursuant to Sections 1507 and 1521.**

59.   The Foreign Representative submits that, in accordance with sections 1507 and 1521 of the Bankruptcy Code, this Court should grant any relief requested in the Proposed Order that goes beyond the automatic relief granted pursuant to section 1520—including enforcement of the releases and injunctions in the Scheme.

---

[7]   *See In re Vitro, S.A.B. de C.V.*, 470 B.R. 408, 412 (N.D. Tex. 2012), *aff'd sub nom.*, *In re Vitro S.A.B. de CV*, 701 F.3d 1031 (5th Cir. 2012), *cert. dismissed*, 133 S. Ct. 1862 (2013) (recognizing that a board of directors may authorize a person to act as the company's foreign representative in a chapter 15 proceeding); *In re Compania Mexicana de Aviacion, S.A. de C.V.*, Case No. 10-14182 (MG) (Bankr. S.D.N.Y. Nov. 8, 2010) [Dkt. No. 261] (same).   Section 1515(b) of the Bankruptcy Code specifically provides that in the absence of a "certified copy of the decision commencing such foreign proceeding and appointing the foreign representative" or "a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative," a chapter 15 petition may be accompanied by "any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative."   11 U.S.C. § 1515(b).

60.     Upon recognition of a foreign proceeding, section 1521(a) of the

Bankruptcy Code authorizes the Court to grant "any appropriate relief" to a foreign

representative "where necessary to effectuate the purpose of [chapter 15] and to protect the assets

of the debtor or the interests of the creditors," provided that the interests of creditors and other

interested entities are sufficiently protected.  11 U.S.C. §§ 1521(a), 1522(a).  Such relief may

include, but is not limited to:

> (1)     staying the commencement or continuation of an individual
> action or proceeding concerning the debtor's assets, rights, obligations or
> liabilities to the extent they have not been stayed under section 1520(a);

> (2)     staying execution against the debtor's assets to the extent it
> has not been stayed under section 1520(a);

> (3)     suspending the right to transfer, encumber or otherwise
> dispose of any assets of the debtor to the extent this right has not been
> suspended under section 1520(a);

> . . . and

> (7)     granting any additional relief that may be available to a
> trustee, except for relief available under sections 522, 544, 545, 547, 548,
> 550, and 724(a).

11 U.S.C. § 1521(a).  Additionally, the Court may act under section 1507 of the Bankruptcy

Code to provide "additional assistance" to a foreign representative, provided that such assistance

is "consistent with the principles of comity."  11 U.S.C. § 1507; *see also In re Atlas Shipping

A/S*, 404 B.R. 726, 737-38 (Bankr. S.D.N.Y. 2009).[8]

---

[8]     Section 1507(b) provides that in determining whether to provide additional assistance:

> [T]he court shall consider whether such additional assistance, consistent with the
> principles of comity, will reasonably assure—(1) just treatment of all holders of claims
> against or interests in the debtor's property; (2) protection of claim holders in the United
> States against prejudice and inconvenience in the processing of claims in such foreign
> proceeding; (3) prevention of preferential or fraudulent dispositions of property of the
> debtor; (4) distribution of proceeds of the debtor's property substantially in accordance
> with the order prescribed by this title; and (5) if appropriate, the provision of an
> opportunity for a fresh start for the individual that such foreign proceeding concerns.

61.     In deciding whether to grant additional relief under chapter 15, courts are guided by principles of comity and cooperation with foreign courts.  *See, e.g.*, *Atlas Shipping*, 404 B.R. at 738; *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 389 B.R 325, 333 (S.D.N.Y. 2008).  The Supreme Court has held that a foreign judgment should not be challenged in the United States if the foreign forum provides:

> [A] full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it is sitting . . . .

*Hilton* v. *Guyot*, 159 U.S. 113, 202-03 (1895); *see also Victrix S.S. Co., S.A.* v. *Salen Dry Cargo A.B.*, 825 F.2d 709, 713 (2d Cir. 1987) ("Federal courts generally extend comity whenever the foreign court had proper jurisdiction and enforcement does not prejudice the rights of United States citizens or violate domestic public policy."); *In re Bd. of Dirs. of Hopewell Int'l Ins. Ltd.*, 238 B.R. 25, 60, 66-68 (Bankr. S.D.N.Y. 1999), *aff'd*, 275 B.R. 699 (S.D.N.Y. 2002) (noting that comity should be accorded to foreign court orders as long as "it is shown that the foreign court is a court of competent jurisdiction, and that the laws and public policy of the forum state and the rights of its residents will not be violated" (quoting *In re Gee*, 53 B.R. 891, 901 (Bankr. S.D.N.Y. 1985))).

62.     The need to extend comity to foreign proceedings is particularly salient in the bankruptcy context because "[t]he equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding" to bind all creditors and comprehensively effectuate a plan of reorganization.  *Atlas Shipping*, 404 B.R. at

---

11 U.S.C. § 1507(b).

737 (quoting *Victrix*, 825 F.2d at 713-14). Accordingly, this Court has not hesitated to enforce

similar third-party releases in foreign proceedings under section 1507 of the Bankruptcy Code.

*See, e.g.*, *In re Towergate Fin. plc*, Case No. 15-10509-SMB (Bankr. S.D.N.Y. Mar. 27, 2015)

[Dkt. No. 16]; *In re New World Res. N.V.*, Case No. 14-12226-SMB (Bankr. S.D.N.Y. Sept. 9,

2014) [Dkt. No. 20]; *In re Magyar Telecom B.V.*, Case No. 13-13508-SHL (Bankr. S.D.N.Y.

Dec. 11, 2013) [Dkt. No. 26].

      63.    In *In re Metcalfe & Mansfield Alt. Invs.*, 421 B.R. 685 (Bankr. S.D.N.Y.

2010), the court recognized that the proper inquiry is not whether a foreign order approving a

release and injunction would be enforced in a plenary chapter 11 proceeding, but rather, whether

recognition of the foreign court order is a proper exercise of comity in a chapter 15 case.

*Metcalfe* held that a Canadian order approving a release and injunction was enforceable in

chapter 15 under principles of comity because "[t]he U.S. and Canada share the same common

law traditions and fundamental principles of law. Canadian courts afford creditors a full and fair

opportunity to be heard in a manner consistent with standards of U.S. due process. U.S. federal

courts have repeatedly granted comity to Canadian proceedings." 421 B.R. at 698; *see also In re

Sino-Forest Corp.*, 501 B.R. 655, 663-64 (Bankr. S.D.N.Y. 2013).

      64.    The facts and circumstances here are very similar to those in *Metcalfe* and

*Sino-Forest*. The United States and the U.K. share the same common law traditions and

fundamental principles of law. The Scheme Creditors have a full and fair opportunity to vote on

and be heard in connection with the Scheme, in a manner consistent with U.S. standards of due

process. *See* Boothman Declaration, ¶¶ 8, 11, 12, 14, 15. Moreover, failure to enforce the

Scheme Creditors' releases of claims against the Debtor and the Released Parties will result in

prejudicial treatment of certain creditors to the detriment of the Debtor's reorganization efforts

and will prevent the fair and efficient administration of the Restructuring.  If this Court declines

to enforce the releases of claims against the Debtor and the Released Parties in the Scheme, then

certain Scheme Creditors or other entities could seek to obtain judgments in the United States

against the Debtor, the Notes Guarantors or other Released Parties to obtain greater recoveries

than those to which they are entitled under the Scheme.  Furthermore, the releases of claims

against the Debtor and the Released Parties apply to the Scheme Creditors only, and the Scheme

cannot be sanctioned without the approval of a majority in number and at least 75% in value of

the Scheme Creditors voting at the Debtor Scheme Meeting.  Thus, principles of comity support

enforcement of the Scheme and the releases of claims against the Debtor and the Released

Parties therein, whether or not the same relief could be ordered in a plenary chapter 11 case.  *See*

*Metcalfe*, 421 B.R. at 700.

### D.    The Requested Relief Comports with Bankruptcy Code and U.S. Public Policy.

65.    Section 1506 of the Bankruptcy Code provides that nothing in chapter 15

shall prevent the Court from refusing to take an action otherwise required therein if such action

would be manifestly contrary to the public policy of the United States.  11 U.S.C. § 1506.

However, the public policy exception is narrowly construed.  *See, e.g.*, *Metcalfe*, 421 B.R. at

697.  Moreover, the public policy exception must be viewed in light of one of the fundamental

goals of the Bankruptcy Code—the centralization of disputes involving the debtor.  *See, e.g.*, *In

re Ionosphere Clubs, Inc.*, 922 F.2d 984, 989 (2d Cir. 1990) ("The Bankruptcy Code provides for

centralized jurisdiction and administration of the debtor, its estate and its reorganization in the

Bankruptcy Court . . . .") (internal citations and quotation marks omitted).  Indeed, as some

courts have noted:

> American courts have long recognized the need to extend comity to
> foreign bankruptcy proceedings because the equitable and orderly

> distribution of a debtor's property requires assembling all claims against
> the limited assets in a single proceeding; if all creditors could not be
> bound, a plan of reorganization would fail.

*Atlas Shipping*, 404 B.R. at 733 (internal quotation marks omitted) (citing *Victrix*, 825 F.2d at

713-14); *see also JP Morgan Chase Bank* v. *Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d

418, 424 (2d Cir. 2005) ("We have repeatedly held that U.S. courts should ordinarily decline to

adjudicate creditor claims that are the subject of a foreign bankruptcy proceeding.").

66.    Recognizing the English Proceedings (including the Scheme and English

Orders) and enforcing the releases of claims against the Debtor and the Released Parties in the

Scheme will assist the orderly administration of the Debtor's estates by the English Court,

consistent with the public policy of the United States that the Bankruptcy Code embodies.  *See*

*Sino-Forest*, 501 B.R. at 665 (enforcing foreign order containing third-party releases, noting that,

in the Second Circuit, "where the third-party releases are not categorically prohibited, it cannot

be argued that the issuance of such releases is manifestly contrary to public policy").  If this

Court does not recognize the Scheme, including the releases of claims against the Debtor and the

Released Parties therein, then the English Proceedings face legal uncertainty and the Scheme,

and therefore the Restructuring, may not succeed.

67.    Additionally, failure to enjoin the Scheme Creditors or enforce the

releases in the United States may result in unnecessary enforcement costs or the piecemeal

disposition of assets to the detriment of the Debtor and its various stakeholders.  The purpose of

chapter 15 is to prevent such harms.  *See* 11 U.S.C. § 1501(a) (noting that, among other

objectives as fully described below, chapter 15 facilitates "the rescue of financially troubled

business" and provides for the "fair and efficient administration of cross-border insolvencies").

Avoiding such potential outcomes through the formal recognition of the English Proceedings and

enforcement of the Scheme and the English Orders in the United States is consistent with U.S.

public policy as embodied in the Bankruptcy Code.

68.     Additionally, Congress articulated specific objectives for chapter 15 of the

Bankruptcy Code including:

>    (1)     cooperation between--

>    (A)     courts of the United States, United States trustees, trustees, examiners, debtors, and debtors in possession; and

>    (B)     the courts and other competent authorities of foreign countries involved in cross-border insolvency cases;

>    (2)     greater legal certainty for trade and investment;

>    (3)     fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including the debtor;

>    (4)     protection and maximization of the value of the debtor's assets; and

>    (5)     facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving employment.

11 U.S.C. § 1501(a).

69.     Recognition of the English Proceedings as foreign main proceedings

comports with all of these objectives.  It will enable the Debtor to fully implement the Scheme,

which forms an integral part of the Restructuring (which has the support of the Debtor's key

stakeholders), thereby preserving value and saving jobs.  Granting recognition to the English

Proceedings also facilitates the fair and efficient administration of the Debtor's assets,

centralizing its restructuring efforts in the Debtor's home jurisdiction, subject to supervision by

the English Court.  Doing so promotes cooperation between foreign jurisdictions and comity

among tribunals.  Notably, because implementation of the Scheme and the Restructuring is

contingent upon this Court's entry of the Proposed Order recognizing the Scheme, failure to enter the Proposed Order will prevent the Debtor from implementing the Scheme and consummating the Restructuring.

70. In sum, the Chapter 15 Case effectuates the principal objectives Congress articulated when it enacted chapter 15 of the Bankruptcy Code, and otherwise comport with U.S. public policy.

## NOTICE

71. Notice of this Motion will be provided to: (i) the Debtor; (ii) the U.S. Trustee; and (iii) all parties entitled to notice in accordance with the *Application Pursuant to Federal Rules of Bankruptcy Procedure 2002(m), 2002(q), 9006(c)(1) and 9007 for an Order Scheduling a Hearing on Recognition of Foreign Main Proceedings and Specifying Form and Manner of Service of Notice.*

## NO PRIOR REQUEST

72. No previous request for the relief sought herein has been made by the Foreign Representative to this Court or any other court.

## CONCLUSION

WHEREFORE, the Foreign Representative respectfully requests the entry of the

Proposed Order granting the relief requested herein and such other and further relief as is just

and proper.

Dated:    New York, New York               Respectfully submitted,
          October 24, 2016
                                           PAUL, WEISS, RIFKIND, WHARTON &
                                           GARRISON LLP

                                           /s/ Alan W. Kornberg
                                           Alan W. Kornberg
                                           Adam M. Denhoff
                                           Jeanne L. John
                                           1285 Avenue of the Americas
                                           New York, New York  10019
                                           Telephone: (212) 373-3000
                                           Facsimile: (212) 757-3990
                                           akornberg@paulweiss.com
                                           adenhoff@paulweiss.com
                                           jjohn@paulweiss.com


                                           *Attorneys for the Foreign Representative*

## VERIFICATION OF CHAPTER 15 PETITION

STEFAN RICKETTS, pursuant to 28 U.S.C. § 1746, hereby declares under penalty of perjury under the laws of the United States as follows:

I am the authorized foreign representative of the Debtor with respect to the English Proceedings.  In that capacity, I have full authority to verify the *Verified Petition for Recognition of Foreign Main Proceedings and Motion for Order Granting Related Relief Pursuant to Sections 1504, 1507, 1515, 1517, 1520 and 1521 of the Bankruptcy Code* (the "Petition and Motion") on behalf of the Debtor.

I have read the Petition and Motion and the other Supporting Documents (as defined therein), and I am informed and believe that the factual allegations contained therein are true and accurate to the best of my knowledge, information and belief.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated:    October 24, 2016

_____
STEFAN RICKETTS