**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 15 |
| EnQuest PLC,[1] | Case No. 16-_____ (___) |
| Debtor in Foreign Proceedings. | |

## DECLARATION OF STEFAN RICKETTS IN SUPPORT OF (I) VERIFIED PETITION FOR RECOGNITION OF FOREIGN MAIN PROCEEDINGS AND MOTION FOR ORDER GRANTING RELATED RELIEF PURSUANT TO SECTIONS 1504, 1507, 1515, 1517, 1520 AND 1521 OF THE BANKRUPTCY CODE; AND (II) CERTAIN RELATED RELIEF

I, STEFAN RICKETTS, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States as follows:

1.      I am the General Counsel and Company Secretary of EnQuest PLC (the "Debtor"), which has commenced proceedings (the "English Proceedings") under Part 26 of the Companies Act 2006 of England and Wales, as modified, amended or re-enacted from time to time, pending before the High Court of Justice of England and Wales (the "English Court").

2.      I joined the Debtor in 2012 and am responsible for all legal, company secretarial matters and for the Debtor's "Risk Management Framework." Prior to joining the Debtor, I was a partner at Fulbright & Jaworski, LLP, heading its energy and natural resources practice in the Asia-Pacific region. I had previously been Group General Counsel at BG Group plc. I, after graduating from the University of Bristol with a degree in law, began my early career as a solicitor with Herbert Smith, and have significant experience as a lawyer and in

---

[1]     The Debtor in the foreign proceedings, along with the last four digits of its registered company number, is EnQuest PLC [0891]. The location of the Debtor's corporate headquarters and registered office is: Cunard House, 5th Floor, 15 Regent Street, London, SW1Y 4LR, United Kingdom.

management working across the energy chain and in all phases of project development and operations.

3.    I have been actively involved in the proposed restructuring of the Debtor (the "Restructuring") that will be effectuated pursuant to, among other things, a scheme of arrangement (the "Scheme") if such Scheme is duly approved and sanctioned by the English Court in the English Proceedings, all in accordance with applicable English law.  Accordingly, I have knowledge of the matters described herein.

4.    On October 20, 2016, I was duly appointed as the foreign representative (the "Foreign Representative") of the Debtor by a committee appointed by the board of directors of the Debtor.  A copy of the minutes of the committee meeting at which I was appointed as the Foreign Representative is attached hereto as Exhibit A.  On October 24, 2016, the English Court entered an order (the "Convening Order"), a copy of which is attached hereto as Exhibit B, authorizing the Debtor to, among other things: (i) convene a meeting of the Scheme Creditors[2] for the purpose of voting on the Scheme (the "Debtor Scheme Meeting") to be held at 11.00 am (London time) on November 14, 2016, at the offices of Ashurst LLP, Broadwalk House, 5 Appold Street, London, EC2A 2HA United Kingdom; and (ii) distribute the Explanatory Statement (as defined below), together with an account holder letter for use by the Scheme Creditors in connection with the Debtor Scheme Meeting, to all Scheme Creditors.  The Convening Order also declared that I am authorized and empowered to act as the foreign

---

[2]    "Scheme Creditors" means: (i) the High Yield Notes Trustee; (ii) the Depository Trust Company, as the registered holder of the High Yield Notes Global Notes; (iii) Cede & Co as nominee for the Depository Trust Company; (iv) the High Yield Noteholders, as contingent creditors; (v) the Retail Notes Trustee; (vi) Société Générale Bank and Trust as the common depositary for Euroclear and Clearstream, Luxembourg, as the registered holder of the global registered certificate representing the Retail Notes; (vii) the Retail Noteholders, as contingent creditors; and (viii) Euroclear UK & Ireland Limited (or its nominee) in its capacity as the holder (through its account(s) in Euroclear) of underlying Retail Notes which are represented by Crest depository interests.

representative of the Debtor in respect of any chapter 15 case that may be commenced in the United States.

5.    I submit this declaration (the "Declaration") in support of the following motions and other documents (collectively, the "First-Day Pleadings"): (i) the *Verified Petition for Recognition of Foreign Main Proceedings and Motion for Order Granting Related Relief Pursuant to Sections 1504, 1507, 1515, 1517, 1520 and 1521 of the Bankruptcy Code* (the "Petition and Motion"); and (ii) the *Application Pursuant to Federal Rules of Bankruptcy Procedure 2002(m), 2002(q), 9006(c)(1) and 9007 for an Order Scheduling a Hearing on Recognition of Foreign Main Proceedings and Specifying Form and Manner of Service of Notice*.

6.    I am authorized by the Debtor to submit this Declaration on its behalf in support of the First-Day Pleadings.

7.    I am an individual over the age of 18 and, if called upon, could testify to all matters set forth in this Declaration.  Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, information supplied to me by other members of the Debtor's management and professionals, or learned from my review of relevant documents or upon my opinion based upon my experience and knowledge of the Debtor's industry, operations and financial condition.  If called upon to testify, I could and would testify competently to the facts set forth herein.

## BACKGROUND

### A.    Overview of the Debtor's Business

8.    The Debtor is an oil and gas production and development company focused on maturing assets and undeveloped oil fields.  The Debtor and its subsidiaries

(collectively, the "Group") operate predominantly in the U.K. Continental Shelf.  For the 12-month period ending on May 31, 2016, the Group was the largest independent oil producer in the North Sea, with production from offshore oil fields in the U.K. Continental Shelf.

9.     The Debtor's producing operated assets in the U.K. Continental Shelf include the Thistle/Deveron, Heather/Broom, Dons, Greater Kittiwake and Alma/Galia oil fields. The Debtor also has an interest in the non-operated Alba producing oil field.  As of June 30, 2016, the Group had interests in 29 U.K. production licenses covering 41 blocks or part-blocks and was the operator of 26 of those licenses.  The Group also has two currently producing assets in Malaysia: PM8/Seligi and Tanjong Baram.

10.     The Group's primary development asset is the Kraken development, which the Group operates and in which it owns a 70.5% working interest.  The Kraken development is the Group's largest project to date and one of the largest projects in the U.K. Continental Shelf in recent years.  The Debtor expects the Kraken development to deliver first oil in the first half of 2017.  The Group also owns a 50% working interest in, and is the operator of, the Scolty/Crathes development, which was the only offshore pure oil field approved by the U.K. Oil and Gas Authority in 2015.[3]  The Debtor expects that the Scolty/Crathes fields will deliver first oil around the end of 2016.

11.     The Group's average daily production on a working interest basis for the six-month period ending on June 30, 2016, was 42,520 boepd, and its net 2P reserves were 216 MMboe as of January 1, 2016.  During the first half of 2016, the Debtor's producing assets generated EBITDA of $242.9 million.

---

[3]     The Oil and Gas Authority was established to regulate, influence and promote the U.K. oil and gas industry, in conjunction with other regulatory authorities, and has a range of powers to deliver on this mandate.

B.    **The Debtor's Pre-Restructuring Corporate and Capital Structure**

12.    The Debtor was incorporated under the laws of England and Wales on January 29, 2010.  The Debtor's headquarters and registered office is located at 5th Floor Cunard House, 15 Regent Street, London, SW1Y 4LR, United Kingdom.

13.    The Debtor's shares are publicly listed on both the London Stock Exchange and the NASDAQ OMX Stockholm under the symbol "ENQ."  The Debtor's outstanding share capital consists of 802,660,757 ordinary shares, which carry one vote each.

14.    As noted above, most of the Group's assets are located in the U.K.  As of August 31, 2016, the Group employed approximately 433 people, approximately 291 of which work in the U.K.  The Debtor's U.S. assets are (i) a $50,000 undrawn professional fee retainer (the "Retainer") held by Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul, Weiss"), as counsel to the Foreign Representative and the Debtor, in a non-interest bearing account located with Citibank, N.A. in New York, New York, and (ii) intangible contract rights under the High Yield Notes Indenture (as defined below), which is governed by New York law.  As of June 30, 2016, the Debtor had total consolidated assets of approximately $3.97 billion and total consolidated liabilities of approximately $3.23 billion.

15.    The Debtor is the principal borrower under the Senior Secured Revolving Credit Facility Agreement, dated as of March 6, 2012 (as amended, supplemented or otherwise modified from time to time, the "Existing RCF") between, among others, the Debtor, as an original borrower, and BNP Paribas, as facility agent.  Borrowings under the Existing RCF may be used to fund the Debtor's oil and gas-related expenditures and for general working capital purposes.  The aggregate commitments under the Existing RCF are $1.2 billion, which can in certain circumstances be increased to $1.7 billion.  As of October 18, 2016, approximately

$1,002,277,000 was outstanding under the Existing RCF and the Group had utilized letters of credit of $7 million.

16.     Pursuant to that certain Senior Notes Indenture, dated as of April 9, 2014 (as amended, supplemented or otherwise modified from time to time, the "High Yield Notes Indenture"), between, among others, the Debtor, as issuer, and Deutsche Trustee Company Limited, as trustee (the "High Yield Notes Trustee"), the Debtor issued $650 million in aggregate principal amount of 7.0% senior unsecured notes due April 15, 2022 (the "High Yield Notes"). The High Yield Notes Indenture and the guarantees of the High Yield Notes (described below) are governed by New York law. A copy of the High Yield Notes Indenture is attached hereto as Exhibit C.

17.     Pursuant to that certain Trust Deed (as amended, supplemented or otherwise modified from time to time, the "Trust Deed"), dated as of January 24, 2013, between, among others, the Debtor, as issuer, and U.S. Bank Trustees Limited, as trustee (the "Retail Notes Trustee"), the Debtor issued £155 million in aggregate principal amount of 5.5% senior unsecured retail notes due February 15, 2022 (the "Retail Notes," and, together with the High Yield Notes, the "Notes") under its £500 million Euro Medium Term Note Program.

18.     The Notes are guaranteed by certain of the Debtor's direct and indirect subsidiaries, being EnQuest NWO Limited, EnQuest Heather Limited, EnQuest Britain Limited, EnQuest Heather Leasing Limited, EnQuest ENS Limited, EnQuest Global Limited and EQ Petroleum Sabah Limited (collectively, the "Notes Guarantors"). The Notes Guarantors are all direct and indirect subsidiaries of the Debtor and are also borrowers under the Existing RCF.

19.     The High Yield Notes and the Retail Notes rank *pari passu* in right of payment with each other and are senior unsecured obligations of the Debtor. However, pursuant

6

to the terms of a subordination agreement, dated April 9, 2014 (as amended, supplemented or otherwise modified from time to time), the guarantees in respect of the Notes are subordinated to the Notes Guarantors' obligations under the Existing RCF.

20.    The Group currently has surety bond facilities (the "Surety Bond Facilities") provided by HCC International Insurance Company PLC and Liberty Mutual Insurance Europe in respect of certain of the Group's decommissioning obligations in the U.K. The Surety Bond Facilities are for an aggregate amount of £89.2 million and $5.0 million, of which £2.0 million mature in September 2017, with the remaining amount maturing in December 2016.

21.    The Group also maintains certain commodity hedges and foreign exchange derivatives to manage its exposure to movements in oil and gas prices and currency fluctuations, respectively.  In connection with these activities, the Group has entered into ISDA master agreements (the "Hedging Agreements") with several hedging partners, the ("Hedging Banks").  The aggregate outstanding amount under the Hedging Agreements is secured and ranks *pari passu* with the Existing RCF.

## C.    Effect of the Low Oil Price Environment on the Debtor's Operations

22.    Oil prices have declined significantly since the second half of 2014, with the average realized price for the Group's U.K. Continental Shelf and Malaysian oil sales (excluding hedging) together decreasing from approximately $100.60 per barrel for the year ended December 31, 2014, to $50.90 per barrel for the year ended December 31, 2015, and from approximately $58.00 per barrel for the six months ended June 30, 2015, to $41.00 per barrel for the six months ended June 30, 2016.  The Brent crude oil benchmark (which is the benchmark against which the Group's U.K. Continental Shelf production is priced) reached a low of $27.88

per barrel on January 20, 2016.  Although oil prices have stabilized somewhat, they remain

significantly below the levels that prevailed in 2013 and the first half of 2014 (with the Brent

crude oil benchmark at a high of $118.90 on February 8, 2013).  The Brent crude oil benchmark

was $49.99 per barrel as of October 17, 2016.  This reduction in oil prices has had a significant

negative impact on the Group's revenues and cash flows from operating activities.

23.     In response to the decline in oil prices, the Group has set a number of

strategic priorities including delivering on execution, streamlining operations, and strengthening

its balance sheet.  The Group has continued to focus on delivering a strong operational

performance, as demonstrated by the 31.1% increase in the Group's net daily average production

in 2015 and a 43.3% increase in the net daily average production in the six months ended June

30, 2016 (compared to the same period in the prior year), and reduced operating costs described

in more detail below.  The Group has also taken a number of additional measures to address the

impact of the decline in oil prices and the Group's cash flow constraints, including the following:

(a)     Negotiating amendments to certain financial covenants in
the Existing RCF and the Retail Notes: In January 2015, the Group
negotiated temporary amendments to certain of the financial covenants in
the Existing RCF, raising the net debt/EBITDA covenant to 5.0x and
reducing the ratio of EBITDA to financing charges to a minimum of 3.0x,
both until mid-2017, thereby providing the Debtor with additional
headroom in the low oil price environment.  In May 2015, following
approval by the Retail Noteholders (as defined below), the financial
covenants in the Retail Notes were amended to align them with the
amendments to the Existing RCF.  The Debtor is seeking further changes
to the Existing RCF and the Retail Notes as part of the Restructuring.

(b)     Engaging in commodity hedging activities: In line with its
financial policies, the Group entered into a number of commodity hedging
contracts in 2014, partially hedging the Debtor's exposure to fluctuations
in oil prices.  The Group entered into additional hedging contracts in 2015
as a response to the continued low oil price environment.  As of December
31, 2015, the Group's commodity hedging contracts included bought put
options over 8MMbbls maturing throughout 2016, with an average strike
price of $68.00 per barrel, and oil swap contracts to sell 2MMbbls at
$66.64 per barrel maturing throughout 2016.  These hedging arrangements

8

considerably mitigated the fall in the Group's revenues for the year ended December 31, 2015, as the Group recognized $261.2 million in realized gains from their oil commodity hedges and other oil derivatives during the year ended December 31, 2015.  As of June 30, 2016, the Group's commodity hedging contracts included bought put options over 4.3 MMbbls at an average price of $68 per barrel maturing throughout 2016 and oil swap contracts to sell 1.3 MMbbls at an average price of $67 per barrel maturing throughout 2016.  The Debtor has also sold 500,000 barrels per month for the first half of 2017 (3 MMbbls total) at a fixed price of $49 per barrel and has bought a call (nil cost) for the same notional quantity, with a strike at $57.25.  Should the price rise above $57.25, the Group will receive the difference to offset the loss it would make on the $49 per barrel swaps.  During the first six months of 2016, the Group realized $128.1 million in revenue relating to its commodity hedging activities, which partially offset the decline in oil sales.  Since June 30, 2016, the Group entered into hedging arrangements for over one million barrels of 2017 production (73 kbbls per month) at a fixed price of $51.50.  In addition, the Group hedged 500,000 barrels for the first half of 2017 at $54.50.

(c)    Divesting non-core assets:  In 2015, as part of its investment prioritization program, the Group disposed of its interests in assets in Norway, Egypt and Tunisia and its exploration assets in Malaysia.  The Debtor also relinquished its interests in a number of exploration licenses in the U.K.  These divestments have allowed the Group to focus on enhancing production at its currently producing assets, including bringing Alma/Galia into full production, and developing its core development assets—Kraken and Scolty/Crathes.

(d)    Reducing operating costs:  Although the Group has always been focused on cost efficiency, it has made further significant cuts to its cost base since the decline in oil prices, including through lowering supply chain, contractor and staff costs, moving its procurement team to Dubai to take advantage of lower cost structures and working with the Sullom Voe Terminal operator to reduce gross cost levels.  The Debtor reduced average unit operating costs in 2015 to $30 per barrel (compared to $42 per barrel in 2014) and in the first half of 2016 to $23 per barrel (compared to $39 per barrel in the first half of 2015).  The Debtor expects its average unit operating costs for the full year 2016 to be around the lower end of the guidance of $25-27 per barrel and expects unit operating costs to decrease to the low $20s per barrel when Kraken comes on-stream.

(e)    Reducing capital expenditure on the Kraken development:  The gross full cycle capital expenditure estimate for Kraken has been reduced by approximately $675 million since the development was sanctioned in 2013, including the latest reduction of an additional $100

million announced in October 2016.  The expected gross full cycle project cost has therefore been reduced from approximately $3.2 billion at sanction to approximately $2.5 billion.

(f)     Improving future cash flows through the development of Kraken and Scolty/Crathes: The Debtor expects that Kraken will deliver first oil in the first half of 2017 and that the Scolty/Crathes fields will deliver first oil around the end of 2016.  The increase in production and, as a result, revenues brought about by the completion of these developments, combined with reduced capital expenditure and operational costs, would improve the Group's cash flow position.

(g)     Deferring certain trade creditor obligations: The Group recently agreed to the deferral of certain payments owed to several of its key trade suppliers, particularly those involved in the Kraken development, which the Debtor believes demonstrates the trade suppliers' willingness to support the Debtor.  Pursuant to these arrangements, these trade suppliers have agreed for outstanding liabilities to be deferred in accordance with agreed repayment profiles, allowing the Group to repay these liabilities through periodic payments between October 2016 and April 2019.

**D.     Events Preceding Commencement of the English Proceedings**

24.     Notwithstanding the measures adopted (as described above), the recent decline in oil prices and the continuing low oil price environment have had a significant negative impact on the Group's revenues, liquidity and available cash resources.  This situation has been exacerbated by the Group's level of debt and the significant cash resources required to service the interest on this debt, as well as by the significant capital expenditure required for development assets—particularly, the Kraken development asset, the Group's largest project to date.  These combined factors have put considerable pressure on the Group's cash flows.

25.     Additionally, an interest payment of $22.75 million has been due on the High Yield Notes since October 17, 2016 (the "October Interest Payment"), which the Debtor has not paid, and does not anticipate that it will be able to pay.  If the October Interest Payment is not made within the applicable 30-day grace period and there is no interest payment deferral agreed to by the requisite majority of holders of the High Yield Notes (the "High Yield

10

Noteholders") (being 90% or more of the aggregate principal amount outstanding), this would constitute an event of default under the High Yield Notes and would trigger cross defaults across the Group's other debt instruments and facilities.

26.    In addition, the Group has, since January 2015, obtained waivers from lenders under the Existing RCF (the "RCF Lenders") in respect of the liquidity covenant contained in the Existing RCF, and the current waiver from this covenant expires on December 31, 2016.  To the extent that the Group is unable to improve its liquidity position or obtain further waivers from the RCF Lenders, the Group could fail to meet the liquidity covenant when next tested on December 31, 2016, or on a subsequent test date, which would constitute an event of default under the Existing RCF and would trigger cross defaults across the Group's other debt instruments and facilities.

27.    Although the Group has already undertaken a number of measures to mitigate the impact of the low oil price environment and address the Debtor's working capital shortfall (as described above), the Debtor believes that in order for the Group to continue to pursue its current strategy (and, in particular, bring Kraken to first oil) and maintain the viability of the Group's business going forward, a longer term solution is needed to strengthen the Group's liquidity position and reduce the burden of the Group's debt service obligations on its business.

28.    In addition to the measures taken by the Debtor described above, it has explored a number of other options to strengthen its liquidity position and reduce the burden of its debt service obligations.  Specifically, the Debtor has engaged in discussions to sell additional assets, including with Delek Group Ltd. regarding the potential farm-out of 20% of the Debtor's interest in the Kraken development; however, the Debtor and Delek Group Ltd. have been unable

to reach an agreement. The Debtor has also explored refinancing the Existing RCF or the Notes; but, given the size of the available commitments under the Existing RCF and the outstanding principal amount of the Notes, coupled with current macroeconomic conditions and the depressed oil price environment, the Debtor does not believe it would be possible to refinance the Existing RCF or the Notes on the same or more favorable terms. Additionally, the Debtor has engaged in discussions with various third-party lenders and the Debtor's key stakeholders, including the RCF Lenders and the informal ad hoc committee of High Yield Noteholders (the "Ad Hoc Noteholder Committee"), regarding the incurrence of new debt; nevertheless, the Debtor has concluded that additional debt financing on acceptable terms other than in connection with the Restructuring is not available within the time frame necessary to alleviate the pressure on its liquidity.

29.    The Debtor has engaged in extensive negotiations with its relevant stakeholders in order to address these issues and, as a result, has proposed the Restructuring, of which the Scheme is an integral part. The Restructuring, if implemented, is likely to enable the Group to complete the Kraken and Scolty/Crathes developments, which the Debtor expects will lead to both significant increases in production and significant decreases in average operating costs across the business. Consummation of the Restructuring, and completion of the Kraken and Scolty/Crathes developments, will put the Group in a stronger position to meet current oil market conditions as the Debtor continues to consider that the Group's fundamental business, with its strategy of targeting mature and marginal oil assets and its focus on cost efficiency, is well placed to withstand a prolonged period of low oil prices.

30.    On October 11, 2016, following negotiations with its key stakeholders, including RCF Lenders and the Ad Hoc Noteholder Committee, the Debtor entered into a lock-

up agreement (the "Lock-up Agreement") with: (i) all of the RCF Lenders; (ii) all of the Hedging

Banks; and (iii) High Yield Noteholders holding approximately 61% of the aggregate principal

amount of outstanding High Yield Notes.  Pursuant to the Lock-up Agreement, the parties

agreed, among other things and subject to certain conditions, to take all steps and other actions

reasonably necessary to support, facilitate, implement, consummate or otherwise give effect to

the Restructuring, including, in respect of the participating High Yield Noteholders, by attending

the Debtor Scheme Meeting in person or by proxy and voting in favor of the Scheme, and by not

taking certain enforcement actions with respect to the Debtor, including in respect of the October

Interest Payment.

31.    Due to the diverse nature of the holders of the Retail Notes, it was not

possible for the Debtor to approach all of the holders of the Retail Notes (the "Retail

Noteholders") in advance of the announcement of the Restructuring including, in particular, the

Scheme.  However, the Debtor has consulted on a confidential basis with a number of holders,

who together hold a significant proportion of the Retail Notes, in order to obtain their indicative

support for the proposals contemplated by the Scheme and the Restructuring.  The feedback from

such Retail Noteholders was positive and indicated support for the Restructuring from

professional investors.

**E.     Description of the Scheme and the Restructuring**

32.    The primary objectives of the Restructuring, and therefore the Scheme, are

to: (i) avoid the adverse consequences of an accelerated marketing and sale process of the Group,

or parts of the Group, which may prove value destructive to the operating business, following

completion of which the Debtor expects that it would be placed into insolvent liquidation (the

recovery for Scheme Creditors, among others, in such a scenario would be unpredictable and is

likely to be significantly less than if the Restructuring is successfully completed); (ii) ensure a stable and sustainable Group capital structure, so that the Group will possess a strengthened balance sheet and more appropriate debt service and maturity profile in light of the current market environment, including the prevailing depressed oil price; (iii) enable the Group to direct its cash resources towards bringing its Kraken development to first oil as soon as possible, which the Debtor believes will considerably strengthen the Group's operations (Kraken is expected to increase the Group's current production substantially and has a productive life over 20 years, and it is expected to benefit from lower operating costs, which the Debtor's directors expect will reduce the Group's average unit operating costs to the low $20s per barrel once Kraken is fully on stream); (iv) service the Group's general corporate and working capital requirements; and (v) improve the ongoing liquidity position of the Group, putting it in a stronger position to withstand a period of low oil prices.

33.    If the Restructuring is implemented, the Debtor's directors anticipate that the proposed amended debt profile of the Group (including the Cash Interest Payment Condition (as defined below) in respect of the Notes to be implemented pursuant to the Scheme described further below) and the injection of additional equity capital into the Group will reduce the financial burden on the business, enabling the Group to continue to trade despite the current weak macroeconomic climate in the oil industry.

34.    The Restructuring and the Scheme are described in detail in the explanatory statement that accompanied the Debtor's application to the English Court for a hearing to convene the Scheme Meeting (the "Explanatory Statement"), a copy of which is attached hereto as Exhibit D,[4] and include the following key terms:

---

[4]    The Explanatory Statement attached hereto is in draft, but substantially final, form.  The final version of the Explanatory Statement is expected to be published and distributed to Scheme Creditors on October 25, 2016.

(a)    <u>High Yield Notes Exchange</u>: The High Yield Notes will be exchanged on a dollar-for-dollar basis for new notes (the "<u>New High Yield Notes</u>") to be effected through the Scheme.  The New High Yield Notes will:

(i)    accrue a fixed coupon of 7% per annum payable semi-annually in arrear.  Interest under the New High Yield Notes will only be payable in cash on an interest payment date if: (A) over the six months immediately preceding the day which is one month prior to the relevant interest payment date under the New High Yield Notes, the average end of the day Dated Brent Future (as published by Platts) (or such equivalent price that may replace the dated Brent price from time to time) is equal to or above $65.00 per barrel; and (B) no payment event of default is continuing under the Existing RCF (which shall include any such event of default arising as a result of the aggregate amount of the loans and letters of credit outstanding under the Existing RCF exceeding the aggregate commitments applicable at such time) (collectively, the "<u>Cash Payment Condition</u>").  If the Cash Payment Condition is not satisfied in respect of an interest payment date, interest will not be paid in cash on that interest payment date and will be capitalized and satisfied by the issue of additional New High Yield Notes to holders of the New High Yield Notes outstanding at such time.  The Cash Payment Condition in the New High Yield Notes will cease to apply (and thereafter all payments of interest will be made in cash) upon the earlier of: (A) the repayment in full of the Existing RCF from cash generated from assets of the Group; or (B) the repayment or refinancing in full of the Existing RCF on terms that enable the disapplication of the Cash Payment Condition and future interest on the New High Yield Notes and the Amended Retail Notes (as defined below) to be paid in cash.  Any interest due but not paid on the High Yield Notes prior to the effective date of the Restructuring will be capitalized and added to the principal amount of the New High Yield Notes to be issued pursuant to the Scheme;

(ii)    contain amendments to certain financial indebtedness baskets and a restriction on certain payments to shareholders (and their affiliates) if the Debtor has not redeemed (in cash at par pursuant to a new optional redemption right) the New High Yield Notes in an amount equal to any capitalized interest thereon, together with accrued but unpaid interest.  The Placing and Open Offer (as defined below) will not constitute an "Equity Offering" for the purpose of the optional redemption provisions of the New High Yield Notes and will not build up the Restricted Payments (under and as defined in the New High Yield

Notes) build-up basket or be used to make any Restricted Payments;

       (iii)     have an originally scheduled maturity date of April 15, 2022. The Debtor will have the option (at its absolute discretion) to extend, at any time, the maturity date to April 15, 2023. In addition, the maturity of the New High Yield Notes will be automatically extended to October 15, 2023 if the Existing RCF is not repaid or refinanced in full prior to October 15, 2020;

       (iv)     have the benefit of a new cross default provision such that an event of default under the Amended Retail Notes will give rise to an event of default under the New High Yield Notes;

       (v)     not contain a right of the Debtor to apply the net proceeds of one or more equity offerings in early redemption of the New High Yield Notes at a specified price; and

       (vi)     be issued in global registered form and deposited with a common depositary for Euroclear and Clearstream, Luxembourg. The New High Yield Notes will not be eligible for settlement in The Depository Trust Company. Any New High Yield Notes which cannot be issued to High Yield Noteholders shall be issued to and held by Lucid Issuer Services Limited on trust for the relevant High Yield Noteholder for a period of one year from the date that the Scheme becomes effective.

     (b)     <u>Retail Note Amendments:</u> The Retail Notes will be amended and restated pursuant to the Scheme (the "<u>Amended Retail Notes</u>") and the Amended Retail Notes will:

       (i)     accrue a fixed coupon of 7% per annum payable semi-annually in arrear. Interest under the Amended Retail Notes will only be payable in cash on an interest payment date if the Cash Payment Condition (as described in paragraph 34(a) herein) is satisfied. As with the New High Yield Notes, if the Cash Payment Condition is not satisfied in respect of an interest payment date, interest will not be paid in cash on that interest payment date and will be capitalized and satisfied by the issue of additional Amended Retail Notes to holders of the Amended Retail Notes outstanding at such time. The Cash Payment Condition in the Amended Retail Notes will cease to apply (and thereafter all payments of interest will be made in cash) upon the earlier of: (A) the repayment in full of the Existing RCF from cash generated from assets of the Group; or (B) the repayment or refinancing in full of the Existing RCF on terms that enable the disapplication of the Cash Payment Condition and future interest on the New High

Yield Notes and the Amended Retail Notes to be paid in cash.
Interest on the Amended Retail Notes will continue to accrue from
the immediately preceding interest payment date of August 15,
2016 and be paid on the next interest payment date of February 15,
2017 in cash (subject to the Cash Payment Condition being
satisfied) or be capitalized;

(ii)     contain a restriction on certain payments to
shareholders (and their affiliates) if the Debtor has not redeemed
(in cash at par pursuant to a new optional redemption right) the
Amended Retail Notes in an amount equal to any capitalized
interest thereon, together with accrued but unpaid interest;

(iii)     have an originally scheduled maturity of April 15,
2022 (extended from February 15, 2022.  The Debtor will have
the option (at its absolute discretion) to extend, at any time, the
maturity date to April 15, 2023.  In addition, the maturity of the
Amended Retail Notes will be automatically extended to October
15, 2023 if the Existing RCF is not repaid or refinanced in full
prior to October 15, 2020;

(iv)     not have the benefit of the existing financial
covenants currently incorporated in the trust deed that governs the
Retail Notes;

(v)     have the benefit of a new cross default provision
such that an event of default under the New High Yield Notes will
give rise to an event of default under the Amended Retail Notes;
and

(vi)     continue to be held in global registered form, be
cleared through Euroclear and Clearstream, Luxembourg and be
eligible for settlement in CREST through CREST depositary
interests representing the Amended Retail Notes.

(c)     Existing RCF Amendments: The Existing RCF will be
amended to, among other things: (i) extend the maturity date of the
Existing RCF by two years to October 1, 2021; (ii) split the Existing RCF
into a $1.125 billion term loan facility and a $75 million revolving credit
facility, amending the margin on each of the facilities and cancelling the
accordion feature; (iii) amending and resetting certain of the financial
covenants to allow the Group sufficient headroom; (iv) amending the
amortization profile for the repayment of the facilities; (v) incorporating
terms allowing for new super senior hedging; and (vi) restricting certain
activities of the Group including restrictions on acquisitions, disposals,
financial indebtedness and exploration and appraisal expenditure;

17

(d)    Placing and Open Offer: The placing and open offer of, in aggregate, up to 356,738,114 new ordinary shares at an issue price of 23 pence per new ordinary share to raise gross proceeds of, in aggregate, approximately £82 million (the "Placing and Open Offer").  Double A Limited, a company beneficially owned by the extended family of Amjad Bseisu, a director of the Debtor, is proposing to participate in the Placing and Open Offer.  Double A Limited has agreed to participate in the placing on a dollar-for-dollar basis against the total number of new ordinary shares which existing shareholders commit to subscribe for on a *pro rata* basis, up to a maximum of £33.73 million, subject to clawback to satisfy valid applications by qualifying shareholders in the open offer.  In addition, Double A Limited has irrevocably undertaken to take up 31,735,702 new ordinary shares in the open offer, representing its *pro rata* share of the amount to be raised in the open offer; and

(e) Surety Bond Renewal: The renewal of certain of the Group's Surety Bond Facilities for one year from December 2016 and a further year from December 2017, in all circumstances save for the insolvency of EnQuest Heather or the Debtor.

35.    The Scheme also provides that the Scheme Creditors authorize the waiver and release of the Released Parties (as defined in the Scheme), including the Debtor and the Notes Guarantors, from certain claims relating to the High Yield Notes, the Retail Notes, the Scheme and the Restructuring, as applicable.  Specifically, the Scheme provides that the Scheme Creditors authorize the Debtor to enter into the Deeds of Release (as defined in the Scheme), which shall become effective and unconditionally and irrevocably binding upon all Scheme Creditors (and any person who acquires any interest in a Scheme Claim (as defined in the Scheme) after 5:00 pm New York time on November 10, 2016) on the Restructuring Effective Date (as defined in the Scheme).  *See* Ex. D, app. 1 § 4.5, app. 1 at app. 5-app.6.  The Deeds of Release provide that, subject to certain exceptions, the Scheme Creditors release the Released Parties from any claims they may have had, currently have or in the future may have, in connection with the High Yield Notes, the Retail Notes (but excluding, among other things, the Debtor's liability in respect of the covenant to pay principal and interest thereunder), the Scheme and the Restructuring.  *See* Ex. D, app. 1 at app. 5 § 2, at app. 6 § 2.  Additionally, under the

Deeds of Release, the Scheme Creditors covenant not to take certain actions against the Released

Parties with respect to claims arising under the High Yield Notes and the Retail Notes, and the

preparation, negotiation or implementation of the Scheme or the Restructuring.  *See* Ex. D, app.

1 at app. 5 § 3, at app. 6 § 3.

### F.    Consequences of a Failure to Implement the Restructuring

36.    If the Scheme is not approved by the requisite majorities of Scheme

Creditors, recognition of the Scheme pursuant to chapter 15 of the Bankruptcy Code is not

granted, or any of the other inter-conditional requirements or conditions to the Restructuring are

not satisfied (or, where possible, waived) to enable the Restructuring to be implemented in

accordance with the presently proposed timetable, the Restructuring is not likely to be

consummated.  The Debtor believes that, in light of the considerable effort and time which it has

taken for the Debtor to agree to the Restructuring with its key stakeholders (including the RCF

Lenders, the Hedging Banks, the High Yield Noteholders, the providers of the Surety Bond

Facilities, Double A Limited and various other key stakeholders), the prospects of the Debtor and

such key stakeholders agreeing to an alternative transaction that would leave the Group with a

viable capital structure before it would become necessary to place the Debtor (and possibly other

companies in the Group) into an insolvency procedure are unlikely.  The Debtor has based its

assessment that the Group continues to be a going concern on the basis that the Group can rely

on the ability to access adequate funds under the Existing RCF, agree to necessary amendments

across its debt and credit facilities and with certain vendors, and/or access alternative sources of

funding.  The Debtor has enjoyed the support of its RCF Lenders throughout the negotiation of

the Restructuring.  The continued support of the RCF Lenders is now predicated upon and would

be in accordance with the Restructuring as currently proposed.

37.    The Debtor believes that if and shortly after it becomes apparent that the Restructuring is not capable of being implemented (for example, if the requisite majority of Scheme Creditors do not vote in favor of the Scheme, if the English Court decides not to exercise its discretion to sanction the Scheme or if recognition of the Scheme pursuant to chapter 15 of the Bankruptcy Code is not granted), it is likely that the Debtor will commence a marketing and sales process of the Debtor and/or its subsidiaries with a view to effecting the sale in a short period of two to three months.  Completion of the sale is likely to involve the appointment of administrators to the Debtor in England pursuant to the Insolvency Act 1986 (as modified, amended or re-enacted from time to time) (the "U.K. Insolvency Act").

38.    The Debtor believes that if the Restructuring does not proceed and a marketing process for the sale of the Group on an accelerated basis is undertaken, there is likely to be little or no value for High Yield Noteholders or Retail Noteholders.  In addition, if the Debtor is unable to pay the October Interest Payment on the High Yield Notes within the 30-day grace period as described above and the requisite majority of High Yield Noteholders (being 90% or more of the aggregate principal amount outstanding) do not agree to an interest payment deferral, the Debtor is likely to become subject to enforcement action (including, for example, the filing of a winding up petition against the Debtor in England) which, if not terminated or withdrawn, could result in the majority RCF Lenders appointing an administrator to the Debtor pursuant to the U.K. Insolvency Act, with a view to the administrator commencing and/or continuing a marketing process for the sale of the Group on an accelerated basis.  In this scenario, the Debtor believes that there is likely to be little or no value for High Yield Noteholders or Retail Noteholders.  However, the Ad Hoc Noteholder Committee may propose an alternative debt restructuring and seek to engage in discussions with the RCF Lenders and the

Debtor (which may involve providing a deferral of the October Interest Payment if the requisite majority has approved such deferral). The RCF Lenders may or may not decide to give consideration to any such proposal or may consider any such proposal in the context of the Debtor's sales process.

**G.    The English Proceedings**

39.    To implement the Scheme and therefore to implement the Restructuring, the Debtor commenced the English Proceedings on October 18, 2016, by applying to the English Court for a hearing to convene the Debtor Scheme Meeting (the "Convening Hearing"). The application to the English Court was accompanied by (i) the Explanatory Statement and all documents appended thereto (including the Scheme, which is attached as Appendix 1 to the Explanatory Statement), and (ii) a witness statement of Jonathan Anthony Robert Swinney, which is attached hereto as Exhibit E. Prior to the commencement of the English Proceedings, notice of the same was given to the Scheme Creditors by means of a "practice statement" letter, dated October 13, 2016, which is attached hereto as Exhibit F.

40.    On October 24, 2016, the English Court held the Convening Hearing and subsequently issued the Convening Order. The Convening Order (i) confirms that the Debtor Scheme Meeting will be held at 11:00 am (London time) on November 14, 2016, at the offices of Ashurst LLP, Broadwalk House, 5 Appold Street, London, EC2A 2HA, United Kingdom, (ii) confirms the documents and notices that will be sent to the Scheme Creditors, and (iii) declares that the Foreign Representative is authorized to act as foreign representative in respect of the English Proceedings, including in any chapter 15 proceeding in the United States.

41.    It is currently anticipated that the hearing to sanction the Scheme (the "Sanction Hearing") will be held on November 16, 2016. If the English Court enters an order

approving the Scheme (the "Sanction Order"), the Scheme will become effective pursuant to its terms, and thereby binding on all Scheme Creditors of the Debtor wherever located, upon delivery of the Sanction Order to the Registrar of Companies in England and Wales. Importantly, however, this Court's entry of an order recognizing the Scheme in the United States is a condition precedent to the implementation of the Scheme, and therefore, the implementation of the Restructuring.

**REQUESTS FOR RECOGNITION AND RELATED RELIEF**

42.    In connection with the filing of this chapter 15 case, the Debtor has submitted the Petition and Motion.  In addition to the facts set forth above, I believe, after consultation with counsel, that the relief requested by each of the motions is necessary to maximize value for all of the Scheme Creditors and, given that the Scheme is an integral element of the Restructuring, the Debtor's other creditors and stakeholders, to protect the Debtor and its assets in the United States, and to properly administer this case.

43.    As explained in the Petition and Motion, the relief requested therein is necessary to (a) ensure that all of the Scheme Creditors affected by the Scheme are treated consistently, regardless of whether they are located in the U.K. or the United States, (b) protect the Debtor from any lawsuits in the United States from those who are bound by, and benefit from, the terms of the Scheme, and (c) minimize the risk of indemnification and other claims that might be alleged under the High Yield Notes Indenture.

44.    The Debtor has property in the United States and in this jurisdiction.  Paul, Weiss, as counsel to the Foreign Representative and the Debtor, holds the $50,000 Retainer in a non-interest bearing account located with Citibank, N.A. in New York (the "Retainer Account").  The Debtor's funds remain in the Retainer Account as of the date hereof and are the Debtor's

22

property (subject to Paul, Weiss's rights under its engagement letter).  In addition, the High

Yield Notes Indenture and the guarantees granted by certain of the Debtor's subsidiaries in

respect of the High Yield Notes are governed by New York law and contain provisions

submitting the parties thereto to the jurisdiction of the New York state and federal courts.  *See*

Ex. C, §§ 11.8, 11.9.  I am advised that under relevant law, the Debtor's rights under such

instruments constitute interests in property located within the United States.

45.    To the best of my knowledge and belief, the English Proceedings

(a) constitute "foreign main proceedings" within the meaning of 11 U.S.C. § 1502(4), as the

Debtor is headquartered in the U.K., which is its center of main interests, and (b) are judicial

proceedings in the U.K. under English law relating to insolvency or the adjustment of debt in

which the assets and affairs of the Debtor are subject to control and supervision of the English

Court for the purpose of recapitalization or liquidation.  Accordingly, I believe the English

Proceedings constitute a "foreign proceeding" within the meaning of 11 U.S.C. § 101(23).

46.    Finally, as described in the Petition and Motion and as discussed with

counsel, I understand and believe that recognizing the English Proceedings as foreign main

proceedings and granting the relief requested therein on a final basis is consistent with the

purposes of chapter 15 of the Bankruptcy Code and public policy of the United States.

Therefore, I believe that the relief requested in the Petition and Motion is necessary and

appropriate and in the best interests of the Debtor, its creditors and other parties in interest.

## **SECTION 1515(c) STATEMENT**

47.    I am informed that section 1515(c) of the Bankruptcy Code provides that

"[a] petition for recognition shall also be accompanied by a statement identifying all foreign

proceedings with respect to the debtor that are known to the foreign representative."

48.     In compliance with section 1515(c) of the Bankruptcy Code, I hereby

declare that, to my knowledge, the only foreign proceedings (as such term is defined in

section 101(23) of the Bankruptcy Code) pending with respect to the Debtor are the

English Proceedings.

### LIST PURSUANT TO BANKRUPTCY RULE 1007(A)(4)

49.     I am informed that Rule 1007(a)(4) of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules") provides that a foreign representative filing a petition for

recognition under chapter 15 of the Bankruptcy Code shall file with the petition:

> (A) a corporate ownership statement containing the information described
> in [Bankruptcy] Rule 7007.1; and (B) unless the court orders otherwise, a
> list containing the names and addresses of all persons or bodies authorized
> to administer foreign proceedings of the debtor, all parties to litigation
> pending in the United States in which the debtor is a party at the time of
> the filing of the petition, and all entities against whom provisional relief is
> being sought under § 1519 of the [Bankruptcy] Code.

In accordance with Bankruptcy Rule 1007(a)(4), I hereby provide the following information:

(a)     Corporate Ownership Statement: In accordance with Bankruptcy

Rule 7007.1, I confirm that no individuals, corporations or other entities directly or indirectly

own 10% or more of the Debtor's equity interests as of September 30, 2016.  Since September

30, 2016, the Debtor has not received any notification otherwise that would lead me to believe

that the same is not true as of the date of this Declaration.

(b)     Persons or Bodies Authorized to Administer the Foreign

Proceedings: I was appointed by a committee of the board of directors of the Debtor as the

Debtor's foreign representative on October 20, 2016, and the English Court declared on October

24, 2016, that I am authorised and empowered to act as the foreign representative of the Debtor

in respect of any chapter 15 case that may be commenced in the United States.  My contact

address is c/o EnQuest PLC, 5th Floor Cunard House, 15 Regent Street, London, SW1Y 4LR,

United Kingdom.

(c)    <u>Pending Litigation</u>: I am not aware of any litigation pending in the

United States in which the Debtor is a party.

(d)    <u>Provisional Relief</u>: I am not seeking provisional relief at this time

because I am not aware of any imminent threat to the Debtor's assets located in the United States

or to the English Proceedings by virtue of actions in the United States.

*[Remainder of page intentionally left blank.]*

I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: October 24, 2016

By: /s/ Stefan Ricketts
Name:  Stefan Ricketts
Title:    General Counsel and Company Secretary
             of EnQuest PLC